UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

METRIC CONSTRUCTORS,
INCORPORATED,
            *Plaintiff-Appellant,*

    and

J.A. JONES, INCORPORATED,
            *Plaintiff,*

    v.

THE BANK OF TOKYO-MITSUBISHI,
LIMITED, NEW YORK BRANCH;
BARCLAYS BANK PLC, NEW YORK
BRANCH; BAYERISCHE VEREINSBANK,
AG, NEW YORK BRANCH; DAI-ICHI
KANGYO BANK, LIMITED, NEW YORK
BRANCH; MEES PIERSON NV, NEW
YORK AGENCY; CREDIT LOCAL DE
FRANCE; BANK OF TOKYO-MITSUBISHI
TRUST COMPANY,
            *Defendants-Appellees.*

No. 02-1425

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CA-97-369-5-BR(1))

Argued: May 9, 2003

Decided: July 30, 2003

Before WILLIAMS, MICHAEL, and SHEDD, Circuit Judges.

Vacated and remanded by unpublished per curiam opinion.

---

## COUNSEL

**ARGUED:** Douglas Leo Patin, SPRIGGS & HOLLINGSWORTH, Washington, D.C., for Appellant. Thomas Joseph Hall, CHADBOURNE & PARKE, L.L.P., New York, New York, for Appellees. **ON BRIEF:** Eric A. Frechtel, SPRIGGS & HOLLINGSWORTH, Washington, D.C.; Matthew W. Sawchak, ELLIS & WINTERS, L.L.P., Raleigh, North Carolina; Randel E. Phillips, Gregory J. Murphy, Scott M. Tyler, MOORE & VAN ALLEN, Charlotte, North Carolina, for Appellant. Benjamin D. Pergament, CHADBOURNE & PARKE, L.L.P., New York, New York; L. Neal Ellis, Jr., HUNTON & WILLIAMS, Raleigh, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Metric Constructors, Inc. ("Metric") appeals from the district court's order granting summary judgment in favor of several banks (the "Banks") on Metric's claim for unjust enrichment.[1] We conclude that Metric produced substantial evidence to prove each of the four elements of a claim for unjust enrichment under North Carolina law. Accordingly, we reverse the judgment below and remand for further proceedings.

---

[1]The Banks are The Bank of Tokyo-Mitsubishi, Ltd., Barclays Bank PLC, Bayerische Vereinsbank Ag, Dai-Ichi Kangyo Bank, Ltd., Mees Pierson NV, Credit Local De France, and Bank of Tokyo-Mitsubishi Trust Company.

### I.

Metric contracted with Carolina Energy, Limited Partnership ("CELP") to build a multi-million-dollar facility in North Carolina that would convert solid waste into fuel and recyclable materials. Two months after it executed this construction contract, CELP entered into a separate project financing agreement with the Banks. The Banks agreed to lend credit to support CELP's bond financing for the project; in return, CELP gave the Banks a first priority security interest in the project and all its tangible assets. The Banks were not parties to the construction contract, and Metric was not a party to the financing agreements.

The construction contract provided that CELP would make "progress payments" to Metric according to a milestone and payment schedule attached to the contract. Under the payment procedure detailed in the contract, each month Metric submitted to CELP an application for payment describing the milestones completed during the previous month. These applications showed the amount due for each completed milestone and certified that the work was completed in accordance with the terms of the construction contract. In addition, the contract required Metric to provide with each of its applications for payment a waiver and release of lien for itself and its subcontractors "to assure an effective release of liens for previous payments." According to the contract, CELP and an independent engineer had 15 days to review an application for payment and approve a progress payment. CELP then had 10 days to make payment to Metric.

CELP had few assets of its own, and it never paid Metric directly. Under its separate agreement with the Banks, CELP was authorized to submit an application to the Banks for release of funds to pay various obligations, including obligations to Metric. The Banks would release requested funds only if seventeen specific funding conditions were satisfied. Among these conditions were requirements that (1) CELP provide the Banks with unconditional lien waivers from Metric and its subcontractors showing full payment and (2) the Banks and their independent engineer believe that the project would be able to

achieve the debt service coverage ratios set out in the financing agreement.[2]

Thus, each request by Metric for a progress payment was considered in two steps. First, CELP and the Banks' engineer reviewed Metric's application to verify that the performance milestones had been met in compliance with the construction contract. Second, the Banks reviewed CELP's request for release of funds to pay Metric to verify that payment was due and that the other funding conditions had been satisfied. If Metric's request for payment survived both sets of review, then the Banks would transfer funds to Metric directly. The Banks hired Roy F. Weston, Inc. ("Weston") as their engineer to monitor Metric's progress on the project.

Metric began construction in January 1996 and made applications for payment pursuant to the construction contract. For the first nine months of construction, the Banks processed Metric's payment requests (through CELP) without incident. By late September and early October, the Banks were developing significant concerns about the continued financial viability of the project. Weston was reporting to the Banks that the project was not meeting the required debt service coverage ratios, that CELP was agreeing to change orders that significantly raised the cost of the project, and that the relationship between Metric and CELP was deteriorating. In addition, a related project had recently gone into default. Despite these internal concerns (as well as a dispute concerning the lien waiver provided by Metric), Weston and the Banks approved Metric's October 1996 application for payment. It is undisputed that the Banks paid Metric in full for work performed through September 30, 1996 — a total of more than $48 million.

In November 1996, Metric submitted to CELP and Weston an application for payment for October's work, totaling more than $6 million. This application, like Metric's October application, indicated several exceptions to the required lien waiver. Specifically, Metric claimed that it was entitled to at least an additional $1.75 million

---

[2]The debt service coverage ratio was calculated by dividing the project's revenue available for debt service in a particular time period by the projected debt service for that period. The agreement between the Banks and CELP required a debt service coverage ratio of 1.3.

above the contract price (for change orders), and it claimed at least 88 days of delay as the result of various *force majeure* events. Weston visited the site to verify the progress described in the payment application, and it approved the application without qualification. Despite Weston's certification, however, the Banks notified CELP on November 22, 1996 that they would not release the funds requested to pay Metric because the seventeen funding conditions had not been satisfied.

Metric was unaware of the Banks' position for weeks. Meanwhile, Metric submitted its pay application for November's work — more than $8.5 million — and Weston visited the site and approved the application. Weston made no mention to Metric about the Banks' concerns, even after Metric raised a question about the as-yet unpaid November application. Metric sent CELP a notice of default on December 10, 1996, alerting CELP that it had not received payment on the November application. Three days later, CELP notified Metric that the Banks had ceased funding the project. On December 18, 1996, Metric told CELP that it was stopping work for nonpayment. Even after it stopped work, Metric maintained a presence on site through June 1997 to secure the partially-constructed facility while CELP and the Banks attempted to restructure the project's financing.

CELP and the Banks were unable to keep the project afloat. CELP was in default on its bond obligations, and the bond trustee drew on the Banks' letters of credit to repay bondholders. This transaction left the Banks with a loss of more than $30.4 million on the project. The Banks then foreclosed their collateral in the project and conducted a sale under Article 9 of North Carolina's version of the Uniform Commercial Code. This sale netted the Banks only about $2.6 million, so that the Banks' net loss on the project was approximately $27.8 million.

Metric sued the Banks to recover for the work it performed on the project without payment. The district court dismissed Metric's claims for tortious interference with contract and breach of contract, and it rejected Metric's remaining claims — conversion, unfair trade practice, breach of fiduciary duty, civil conspiracy, unjust enrichment, constructive trust, and equitable lien — on summary judgment. Metric appealed the summary judgment with respect to its claims for

unfair trade practice, breach of fiduciary duty, and unjust enrichment. In that appeal, we affirmed the district court's summary judgment for the Banks on the claims for unfair trade practice and breach of fiduciary duty. *Metric Constr., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 230 F.3d 1353 (4th Cir. 2000) (unpublished). We vacated the judgment on Metric's unjust enrichment claim and remanded for further proceedings, holding that the district court improperly grafted onto the unjust enrichment cause of action a requirement that the Banks enjoyed a net gain from the project. *Id.* On remand, the district court again awarded summary judgment to the Banks on Metric's unjust enrichment claim. This appeal followed.

## II.

We review the district court's summary judgment for the Banks *de novo*, taking the facts in the light most favorable to Metric. *See Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). This is a diversity case, and North Carolina law applies. We apply the law in accordance with the decisions of the North Carolina Supreme Court, or where the law is unclear, as the North Carolina Supreme Court likely would apply it. *Private Mortgage Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). We shall not "surmise or suggest . . . expansion" of North Carolina law. *Tritle v. Crown Airways, Inc.*, 928 F.2d 81, 84 (4th Cir. 1990).

The law of unjust enrichment in North Carolina proceeds from the general principle that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." *Booe v. Shadrick*, 369 S.E.2d 554, 555-56 (N.C. 1988) (internal quotations omitted). In order to prevail on a claim for unjust enrichment, a plaintiff must prove that (1) it conferred a benefit on the defendant, (2) the benefit was not conferred officiously or gratuitously, (3) the benefit is measurable, and (4) the defendant consciously accepted the benefit. *Id.* at 556. An unjust enrichment claim is available only in the absence of an express contract between the parties. *Id.*

## A.

North Carolina law requires that a plaintiff seeking recovery for unjust enrichment "must have conferred a benefit on the other party."

*Id.* Metric produced evidence showing that it continued working on the project from October 1996 through the middle of December 1996 and, arguably, through June 1997. Weston, the Banks' engineer, verified that Metric continued meeting construction milestones. This work increased the value of the project, in which the Banks held a first-priority security interest. Even after Metric stopped working on the project, it spent its own resources to secure and maintain the project site and assets.

Rather than challenging the assertion that Metric's work amounted to a benefit, the Banks contend that Metric conferred that benefit upon CELP, not the Banks. The Banks rely upon *Effler v. Pyles*, 380 S.E.2d 149 (N.C. Ct. App. 1989), for the proposition that there can be no claim for unjust enrichment unless the plaintiff conferred a benefit *directly* on the defendant. The district court held that "any benefit that the Banks received was not sufficiently direct to satisfy Metric's burden" on this element.

The "direct benefit" rule applied by the district court derives from an intermediate appellate court's decision on facts readily distinguishable from this construction dispute. The plaintiff in *Effler* co-signed a note to help her daughter and son-in-law buy a house. The children promised to make all the monthly payments on the note, by selling other properties if necessary. The plaintiff's daughter died, and the son-in-law stopped making payments on the note. The plaintiff made the payments instead. When the son-in-law remarried, he transferred the titles to the house and another property to himself and his new wife. The couple then sold the second property but did not apply the proceeds to the plaintiff's note. The plaintiff sued the son-in-law's new wife for unjust enrichment. The Court of Appeals affirmed summary judgment for the new wife, noting that she had received title to the house from her husband, not the plaintiff. *Id.* at 152. "Although he has previously acquired his interest in this property with plaintiff's assistance, this does not satisfy plaintiff's burden of showing that she conferred a benefit directly on defendant." *Id.*

The Banks had a direct interest in the construction project. Indeed, the Banks held a first-priority security interest that was so important to them that they sent their own engineer to monitor Metric's progress and report on its work. The Banks did not receive a fully-matured

benefit by grace, as the new wife in *Effler* received title to her house. Rather, the Banks paid Metric each month as it made progress on their construction project.

More important for this diversity case, the North Carolina Supreme Court has never held that a contractor may not obtain equitable relief from a lender with whom it had no contract. To the contrary, a contractor may be entitled to equitable relief where the contractor completed a project but the lender (with whom the contractor did not have a contract) refused to pay. *Embree Constr. Group, Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 923 (N.C. 1992). This decision suggests a broader approach to unjust enrichment than is indicated by *Effler*'s "direct benefit" rule. Under North Carolina law, it is sufficient for a plaintiff to prove that it has conferred some benefit on the defendant, without regard to the directness of the transaction. Metric produced substantial evidence that it conferred a benefit on the Banks by improving their collateral, and it therefore satisfied the first element under *Booe*.

### B.

Not only must a plaintiff demonstrate that it conferred a benefit on the defendant, but it must also prove that the benefit was not conferred officiously or gratuitously. *Booe*, 369 S.E.2d at 556. In other words, the plaintiff must show that it rendered the services at issue with an expectation of compensation. *Britt v. Britt*, 359 S.E.2d 467, 470 (N.C. 1987); *Jonson v. Sanders*, 132 S.E.2d 582, 584 (N.C. 1963). The burden rests upon the plaintiff to "show circumstances from which it might be inferred that the services were rendered and received with the mutual understanding that they were to be paid for. . . . [S]uch an inference is permissible when a person knowingly accepts from another services of value, or . . . under circumstances calculated to put a reasonable person on notice that the services are not gratuitous." *Lindley v. Frazier*, 55 S.E.2d 815, 816 (N.C. 1949).[3]

---

[3]North Carolina law suggests a presumption that this inference arises whenever a benefit is conferred by one party and consciously accepted by another. *See Allen v. Seay*, 103 S.E.2d 332, 333 (N.C. 1958) (noting the "general rule" that "the performance of valuable services for one who knowingly and voluntarily accepts the benefits thereof raises the implication of a promise to pay").

Metric produced substantial evidence that its work on the project was not gratuitous. As the district court found, Metric worked on the project "in anticipation of payment" as the construction contract provided. Moreover, the Banks sent Weston to the site to monitor Metric's progress for nine months; Weston approved Metric's pay applications; and the Banks wired funds directly to Metric's account. This evidence, taken together, supports an inference that Metric and the Banks understood that Metric's services were to be paid for.[4] *See id.*

The Banks contend that Metric's performance was gratuitous because Metric was obliged to work on the project pursuant to the construction contract with CELP. According to the Banks, there can be no unjust enrichment where the benefit conferred upon the defendant resulted from services rendered by the plaintiff "in discharge of some obligation." *Atlantic Coast Line R.R. v. State Highway Comm'n*, 150 S.E.2d 70, 73 (N.C. 1966). Similarly, the Banks invoke § 110 of the *Restatement of Restitution* for the proposition that "[a] person who has conferred a benefit upon another as the performance of a contract with a third person is not entitled to restitution from the other merely because of the failure of performance by the third person." According to the Banks, the fact that Metric performed its contractual duties to CELP forecloses its claim in equity against the Banks.

This argument fails for at least two reasons. First, *Atlantic Coast*

---

[4]The evidence further demonstrates that the Banks induced Metric's continued work on the project. *See Wright v. Wright*, 289 S.E.2d 347, 351 (N.C. 1982). Despite having serious concerns about the viability of the project, the Banks never communicated to Metric their concerns and never told Metric they intended to stop funding the project. Indeed, Weston continued approving pay applications as late as December 1996 without so much as hinting to Metric that the Banks had concerns about the project.

The inference of mutual expectation of compensation does not arise with respect to work performed after Metric became aware of the Banks' refusal to pay. Thus, Metric's work after December 13, 1996 — the date on which CELP gave Metric notice that the Banks were no longer funding the project — was gratuitous and cannot be the basis for any recovery here.

*Line* merely states that a plaintiff cannot recover for unjust enrichment where it rendered services out of a sense of moral obligation or some obligation imposed by law. 150 S.E.2d at 73. The plaintiff in *Atlantic Coast Line* conferred a benefit on the defendant, but it did so pursuant to a court order (based on a state statute) and not with any expectation of compensation from the defendant. *Id.* There is no suggestion in this case that Metric kept working on the project out of any sense of moral obligation to the Banks, nor was there any statute or court order requiring Metric to do the work. Metric plainly anticipated that it would be compensated for its work.

Second, this is not a case, as the Banks argue, where the contract between the plaintiff and a third party calls for the plaintiff to render services for the benefit of the defendant. *Cf. Restatement of Restitution* § 110. Section 110 describes the classic third-party beneficiary scenario in which *A*'s contract with *B* requires *B* to provide services for *C*. In that situation — where *B* confers a benefit on *C* "as the performance" (and not merely as a result of its performance) of its contract with *A* — *B* cannot recover restitution from *C* simply on account of *A*'s failure to pay *B* pursuant to the contract. Section 110 is inapposite to this case because the construction contract between Metric and CELP made no reference at all to the Banks. In other words, Metric's performance of its contract with CELP did not, by itself, necessitate any benefit to the Banks; that benefit accrued by virtue of the Banks' separate security agreement with CELP. The gravamen of Metric's unjust enrichment claim is that although the Banks were not parties to any contract with Metric, they nevertheless obtained a benefit from Metric's work on the project and that it would be unjust for the Banks to retain that benefit under the circumstances of this case.

The Banks seek to use the contract between Metric and CELP as both a sword and a shield. On one hand, they argue that Metric was required to comply with all the conditions of that contract in order to make a proper claim for payment; they even imply that Metric was required to comply with conditions set out in their separate contract with CELP. On the other hand, the Banks contend that there can be no claim against them in equity because Metric had a contract with CELP.[5] Yet it is precisely because there is no express contract

---

[5]The Banks also argue that their contract with CELP, which expressly disclaimed liability to third parties, somehow shields the Banks from liability to Metric. Of course, Metric was not a party to that contract, and it is immaterial to the outcome of this unjust enrichment case.

between Metric and the Banks that an action for unjust enrichment is available. *See Booe*, 369 S.E.2d 556 ("If there is a contract between the parties the contract governs the claim and the law will not imply a contract.").

## C.

Metric must also prove that the benefit conferred on the Banks is measurable. *Id.* We have already concluded that Metric has demonstrated, at least for summary judgment purposes, that it conferred a benefit on the Banks. We further conclude, with no argument from the Banks to the contrary, that the benefit conferred is measurable. The restitution to be made for unjust enrichment is measured according to the value of the benefit conferred on the defendant, not the plaintiff's loss. *Booe*, 369 S.E.2d at 556. In this case, the value of the benefit conferred on the Banks should be measured as the amount by which Metric's additional work from October through mid-December enhanced the value of the Banks' collateral. *See Britt*, 359 S.E.2d at 470.

## D.

Finally, Metric must prove that the Banks consciously accepted the benefit conferred by Metric's work on the project. *See Booe*, 556. It is undisputed that the Banks were aware that Metric would be installing equipment and otherwise improving the project during October, November, and December 1996. It is also undisputed that the Banks sent Weston to the site each month to monitor Metric's progress. The Banks stayed well informed of Metric's activities at the site, and they consciously accepted every improvement Metric made to their collateral. *See Britt*, 359 S.E.2d at 470. Metric has satisfied this final element of a claim for unjust enrichment.

## III.

In response to the Banks' motion for summary judgment, Metric forecast evidence sufficient to satisfy each of the elements of a claim for unjust enrichment under North Carolina law. Accordingly, we vacate the decision below and remand for proceedings consistent with this opinion.

*VACATED AND REMANDED*