**In re RELAFEN ANTITRUST LITIGATION.**

**MASTER FILE NO. 01–12239–WGY.**

United States District Court,
D. Massachusetts.

May 12, 2004.

Michael J. Boni, Kohn, Swift & Graf, Philadelphia, PA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Bernard J. Bonn, III, Abbey Gardy & Squitieri, New York City, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Jacqueline E. Bryks, Cohen, Milstein, Hausfeld & Toll, New York City, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Neill Clark, Berger & Montague, Philadelphia, PA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Eric Cramer, Berger & Montague, Philadelphia, PA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Nancy F. Gans, Moulton & Gans, PC, Boston, MA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

George G. Gordon, Dechert LLP, Philadelphia, PA, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Timothy C. Hester, Covington & Burling, Washington, DC, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Robert N. Kaplan, Kaplan, Fox & Kilsheimer LLP, New York City, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Kevin T. Kerns, Dechert LLP, Philadelphia, PA, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Richard J. Kilsheimer, Kaplan Fox & Kilsheimer LLP, New York City, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Peter Kohn, Berger & Montague, Philadelphia, PA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, New York City, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Bernard Persky, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, for Meijer Distribution, Inc., Plaintiff.

Matthew A. Porter, Dechert LLP, Boston, MA, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Hollis L. Salzman, Goodkind, Labaton, Rudoff & Sucharow, LLP, New York City, for Meijer Distribution, Inc., Plaintiff.

Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA, for Meijer Distribution, Inc., Meijer, Inc., Plaintiffs.

Christopher N. Sipes, Covington & Burling, Washington, DC, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Joseph A. Tate, Dechert LLP, Philadelphia, PA, for Glaxosmithkline PLC, Smithkline Beecham Corporation, Defendants.

Patrick E. Cafferty, Miller Faucher and Cafferty LLP, Ann Arbor MI, for End Payor Palintiffs.

## MEMORANDUM

YOUNG, Chief Judge.

## I. INTRODUCTION

On November 21, 2003, this Court issued an order allowing the End Payor Plaintiffs' Motion for Class Certification with respect to two exemplar classes certified under Rule 23(b)(3). Order of 11/21/03 [Doc. No. 168]. This memorandum details the analysis that led to that order.

## II. BACKGROUND

This case presents a consolidated action against SmithKline Beecham Corporation and GlaxoSmithKline PLC (collectively "SmithKline") for violations of the antitrust laws related to its patent for the chemical compound nabumetone, which it sells commercially as "Relafen." Parties who purchased Relafen from sources other than SmithKline [1] for purposes other than resale (the "end payors" or "end payor plaintiffs") here moved for class certification under Federal Rule of Civil Procedure 23(b)(2) and (3). [Doc. No. 126].

### A. Factual Background [2]

On December 13, 1983, SmithKline received U.S. Patent No. 4,420,639 (the "'639

---

1. Parties who purchased Relafen directly from SmithKline ("direct purchasers") also moved for class certification. The direct purchasers' mo-

tion was discussed in *In re Relafen Antitrust Litig.*, 218 F.R.D. 337 (D.Mass.2003).

2. Unless otherwise indicated, these facts are drawn from the Court's Memorandum and Or-

patent") for the compound nabumetone, a non-steroidal anti-inflammatory drug. SmithKline commenced commercial sales of nabumetone under the brand name Relafen in February 1992. In August and December of 1997, Copley Pharmaceutical, Inc. ("Copley"), Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA ("Teva"), and Eon Laboratories, Inc. ("Eon") sought approval from the Food and Drug Administration (the "FDA") to market generic nabumetone products. Upon commencement of SmithKline's lawsuits to enforce the '639 patent, however, the FDA stayed approval of the generic drugs for thirty months. On August 8, and December 24, 1998, respectively, the FDA issued tentative approval to Teva's and Eon's generic nabumetone products, but withheld final approval until the conclusion of the thirty-month stay period. That stay period terminated in May 2000.

SmithKline filed the patent suits in question on October 27, 1997 (against Copley), November 13, 1997 (against Teva), and February 17, 1998 (against Eon). The three suits were consolidated and tried before Judge Lindsay of this District. On August 14, 2001, Judge Lindsay issued a sixty-seven-page opinion, which held, *inter alia,* that (1) claims 2 and 4 of the '639 patent were invalid as anticipated by prior art; and (2) the '639 patent was unenforceable because of Smith-Kline's inequitable conduct before the Patent Office. *In re '639 Patent Litig.,* 154 F.Supp.2d 157, 194–95 (D.Mass.2001) (Lindsay, J.). On August 15, 2002, the Federal Circuit affirmed the District Court's decision as to the invalidity of the '639 patent, but did not reach the issue of inequitable conduct. *SmithKline Beecham Corp. v. Copley Pharm., Inc.,* 45 Fed.Appx. 915, 917 (Fed. Cir.2002) (unpublished opinion).[3]

Essentially, the plaintiffs claim that but for SmithKline's wrongful filing of patent lawsuits, consumers could have begun purchasing nabumetone in a competitive market—comprising both Relafen and its generic alternatives—as early as September 1998. Because of the pending litigation, however, the generic alternatives did not become available until after the stay period terminated and SmithKline's patent was invalidated. Teva[4] began marketing its generic products in August 2001, with Eon following suit in February 2002.

## B. Procedural Background

On February 11, 2003, the end payor plaintiffs filed a consolidated class action complaint against SmithKline. [Doc. No. 68 in *Teva Pharm. v. Smithkline Beecham,* Civil Action No. 01–12222–WGY]. The lead end payor plaintiffs, on behalf of themselves and other consumers and health benefit providers, asserted claims under federal and state antitrust laws, state unfair competition statutes, and state consumer protection statutes. Compl. ¶ 1. On September 16, 2003, the end payor plaintiffs moved for class certification under Federal Rule of Civil Procedure 23(b)(2) and (3). [Doc. No. 126]. After hearing oral argument, the Court tentatively denied the motion under Rule 23(b)(2) and allowed the motion under Rule 23(b)(3) subject to review of the end payor plaintiffs' proposed order. *See* 10/23/03 Hr'g Tr. [Doc. No. 156] at 24. The end payor plaintiffs then submitted a proposed order denying the motion under Rule 23(b)(2), and allowing the motion under 23(b)(3) with respect to the following exemplar class:

> All persons or entities who purchased and/or paid for Relafen® (known generically as nabumetone) or generic versions of Relafen® in the states of Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, New York, North Carolina, Tennessee and Vermont ("the Exemplar States") during the period February 1, 1992 through and including June 30, 2003 (the ["]Class Period") for

---

der, issued October 1, 2003, that discussed the parties' motions based on the statute of limitations and the doctrine of collateral estoppel. *In re Relafen Antitrust Litig.,* 286 F.Supp.2d 56 (D.Mass.2003).

**3.** Under the Local Rules for the Federal Circuit, unpublished decisions are not to be cited as precedent, but may be relied upon in asserting "claim preclusion, issue preclusion, judicial estoppel, law of the case, or the like." Fed. Cir. R. 47.6(b).

**4.** Teva acquired Copley (and its generic nabumetone products) in August 1999.

consumption by themselves, their families, or their members, employees, insureds, participants or beneficiaries (the "Class").

Proposed Order at 1. The end payor plaintiffs' proposed exemplar class excluded governmental entities, SmithKline and its officers, subsidiaries, and affiliates; persons or entities who purchased Relafen or its generic equivalents directly from SmithKline or its affiliates; persons or entities who purchased Relafen or its generic equivalents for purposes of resale; persons or entities who continued to purchase Relafen after generic equivalents became available for purchase in August 2001; and persons who, under the terms of their third-party health insurance plans, pay the same fixed price for brand-name and generic prescription drugs. *Id.* The Court examines the terms of the end payor plaintiffs' proposed order below.

### C. Federal Jurisdiction

Having denied certification with respect to the end payor plaintiffs' federal law claims, *see* Order of 11/21/03, at 2 (holding that these claims were inappropriate for injunctive relief), this Court nevertheless retains supplemental jurisdiction over the remaining state law claims. 28 U.S.C. § 1367(a). The advanced stages of other actions forming part of the same controversy, including those brought by a separately certified class of direct purchaser plaintiffs, individual drug-store plaintiffs, and a generic manufacturer,[5] urged the Court to exercise rather than decline jurisdiction. Because the Court has chosen to exercise supplemental jurisdiction, it need not address the end payor plaintiffs' assertion of diversity jurisdiction, *see* 10/23/03 Hr'g Tr. at 9, at length. The Court notes only that the end payor plaintiffs have not established the amount in controversy, with reference to either the named representatives or the members of the end payor class. *See Spielman v. Genzyme Corp.,* 251 F.3d 1, 7 n. 5 (1st Cir.2001) (noting, but not deciding, the question whether the holding in

*Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973)— "that courts may not exercise supplemental jurisdiction over the claims of class action plaintiffs who do not separately meet the jurisdictional minimum"—remains good law); *Payne v. Goodyear Tire & Rubber Co.,* 229 F.Supp.2d 43, 48 (D.Mass.2002) (discussing the "opposite results" reached by the courts in this District that have addressed the question).

## III. DISCUSSION

### A. Legal Standard

On a motion for class certification, "[a] district court must conduct a rigorous analysis of the prerequisites established by Rule 23." *Smilow v. Southwestern Bell Mobile Sys., Inc.,* 323 F.3d 32, 38 (1st Cir.2003) (citing *General Telephone Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). This analysis should not involve a "preliminary hearing into the merits," *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), but rather an inquiry into "whether the requirements of Rule 23 are met," *id.* at 178, 94 S.Ct. 2140 (quoting *Miller v. Mackey International, Inc.,* 452 F.2d 424, 427 (5th Cir.1971)) (internal quotation marks omitted). The moving party bears the burden of establishing the elements necessary for class certification: the four requirements of Rule 23(a) and one of the several requirements of Rule 23(b). *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613–14, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Guckenberger v. Boston Univ.,* 957 F.Supp. 306, 325 (D.Mass.1997) (Saris, J.).

Rule 23(a) imposes four "threshold requirements" applicable to all class actions: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the

---

**5.** The fact that these actions have now settled, *see* Order of 2/13/04 [Doc. No. 286]; Order of 2/13/04 [Doc. No. 62 in *Eon Labs., Inc. v. Beecham Group PLC,* Civil Action No. 03–10506–WGY], does not alter the Court's analysis, because the progress of the present action is now

sufficiently advanced to counsel against declining jurisdiction. *See, e.g.,* Order of 11/21/03 (specifying the form of notice); Order of 2/18/04 (directing that notice be provided to the end payor plaintiffs' class).

representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *Amchem,* 521 U.S. at 613, 117 S.Ct. 2231. In addition to the requirements of Rule 23(a), the moving party must establish the elements of Rule 23(b)(1), (2), or (3). *Amchem,* 521 U.S. at 614, 117 S.Ct. 2231. The end payor plaintiffs here sought certification under Rule 23(b)(2) and (3). Rule 23(b)(2) permits a class action when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2).

Rule 23(b)(3) permits a class action when common questions "predominate over any question affecting only individual members," and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). Matters "pertinent" to evaluating predominance and superiority include:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). This list of pertinent factors is "nonexhaustive." *Amchem,* 521 U.S. at 615–16, 117 S.Ct. 2231.

**B. Class Period**

■ Before considering the requirements of Rule 23, the Court addresses the period for which class damages may be claimed. The end payor plaintiffs proposed that the class period run from "February 1, 1992 through and including June 30, 2003." Proposed Order at 1. They contended that at least with respect to their unjust enrichment claims, "damages could accrue as early as February 1992, when Defendants entered the market under the banner of a patent procured by fraud." End Payor Pls.' Proposed Order Reply [Doc. No. 155] at 3. SmithKline responded that the "Class Period cannot possibly begin before December 1998," the date on which Teva received tentative FDA approval to market generic nabumetone. Defs.' Proposed Order Opp'n [Doc. No. 152] at 3.

The Court notes that at least as a general matter, entry into the marketplace for branded and generic drugs is governed by the FDA rather than the Patent Office. *See* Rebecca S. Eisenberg, Lecture, *Patents, Product Exclusivity and Information Dissemination,* 72 Fordham L.Rev. 477, 488 (2003) (discussing the relationship between the legal regimes administered by the FDA and the Patent Office regarding biomedical research and product development, and describing the FDA's role as a "market gatekeeper"). Accordingly, any profits that SmithKline earned during its initial period of market exclusivity are more properly attributed to the fact that generic competitors lacked FDA approval than to the fact that SmithKline had obtained the '639 patent. *See* 21 C.F.R. 314.108 (providing a period of exclusive FDA approval for "new drug products"—such as Relafen). Eon and Teva obtained tentative FDA approval to market their generic nabumetone products on August 8, and December 24, 1998, respectively. *Relafen,* 286 F.Supp.2d at 60. The end payor plaintiffs have offered no evidence to suggest that these manufacturers could have received earlier approval in the absence of SmithKline's alleged conduct.[6] For this reason, the Court determined that the class period should run from the date of tentative FDA approval, which in the interest of con-

---

6. In its separate action, Eon asserted that it could have filed its abbreviated new drug application as early as December 24, 1996. Am. Compl. [Doc. No. 74] ¶ 51. Yet in support of this assertion, Eon explained only that Smith-Kline's "sham Orange Book listing [of the '639 patent]" and "malicious Sham Infringement Action" resulted in thirty-month stay periods (the earliest of which was triggered in September 1997), and a subsequent 180–day "Generic Exclusivity Period" (which was triggered in August 2001). *See id.* ¶¶ 29, 51–54. Neither of these periods account for the fact that the first applications, filed not by Eon, but by Copley and Teva, were not filed until August 1997. *See* Compl. ¶ 52(a)–(b).

sistency was set, as it was for the direct purchaser plaintiffs' class action, at September 1, 1998.

### C. Rule 23(a)

■ To satisfy Rule 23(a), the end payor plaintiffs must establish numerosity, commonality, typicality, and adequacy. *Amchem*, 521 U.S. at 613–14, 117 S.Ct. 2231. Numerosity is established if the size of a proposed class, even if inexactly determined, is sufficiently large as to make joinder impracticable, given the relevant circumstances. *See McAdams v. Massachusetts Mut. Life Ins. Co.*, No. Civ. A. 99–30284–FHF, 2002 WL 1067449, at *3 (D.Mass. May 15, 2002) (Freedman, J.); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334–35 (E.D.Mich.2001). The end payor plaintiffs have established such impracticability here. Pharmaceutical data indicates that more than four million units of Relafen were dispensed between January and October 2000, and more than three million additional units were dispensed between January and December 2001. Cafferty Decl. [Doc. No. 128], Exs. 1–2 (excerpts from 2001 Red Book (Medical Economics Staff ed., 2001) and 2002 Red Book (Medical Economics Staff ed., 2002)); *see Cardizem*, 200 F.R.D. at 335 (concluding, under analogous circumstances, that national data recording thirteen million prescriptions for the branded drug provided a sufficient basis for the assumption that "there are thousands of class members in Michigan" such that "joinder would be impracticable").

■ The end payor plaintiffs have identified a number of common questions, the resolution of which will "affect all or a substantial number of the class members." *Duhaime v. John Hancock Mut. Life. Ins. Co.*, 177 F.R.D. 54, 63 (D.Mass.1997) (O'Toole, J.) (quoting *Jenkins v. Raymark Indus.*, 782 F.2d 468, 472 (5th Cir.1986)). The questions common to all class members' claims include whether SmithKline engaged in the alleged conduct and whether SmithKline is shielded from liability for any resulting injuries. *See* End Payor Pls.' Mem. [Doc. No. 127] at 3 (citing Compl. ¶ 89); *Cardizem*, 200 F.R.D. at 335 (determining that the plaintiffs had established commonality by identifying as

common questions "whether Defendants' conduct caused injury to Plaintiff class members" and, if it did, how to determine appropriate damages). Because each of the end payor plaintiffs claims injuries resulting from the same alleged conduct, resolving these common questions collectively will "advance the litigation." *Cardizem*, 200 F.R.D. at 335 (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998)).

■ The element of typicality requires that the "named plaintiffs' claims arise from the same course of conduct that gave rise to the claims of the absent [class] members." *Duhaime*, 177 F.R.D. at 63 (alteration in original) (quoting *Burstein v. Applied Extrusion Technologies, Inc.*, 153 F.R.D. 488, 491 (D.Mass.1994) (Collings, M.J.)) (internal quotation marks omitted). As stated above, the claims of each of the end payor plaintiffs, including those of the proposed representatives for the class, arise from the same course of conduct: SmithKline's alleged efforts to delay generic competition. End Payor Pls.' Mem. at 4. Accordingly, the claims of the named plaintiffs are typical of those asserted by other members of the class.

■ The adequacy requirement establishes as an "essential prerequisite" to certification that this Court be certain the named end payor plaintiffs will protect the interests of the class. 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1765. Before addressing the specific inquiries encompassed by the adequacy analysis, the Court turns to SmithKline's more general argument that the named end payor plaintiffs' lack of standing renders them inadequate representatives. Defs.' Opp'n [Doc. No. 130] at 34–35.

SmithKline asserted that the named end payor plaintiffs, Louise Houchins of California, Tyler Fox of Massachusetts, and Emily Feinberg of Massachusetts, having purchased Relafen or its generic alternatives in only some of the specified states, lacked standing to assert the claims of, or to serve as adequate representatives for, class members who made their purchases in the remaining states. *See id.* The end payor plaintiffs rejected this challenge as improper-

ly conflating the standing requirements of Article III with the class certification standards of Rule 23. End Payor Pls.' Reply [Doc. No. 132] at 33.

In support of its standing challenge, SmithKline cited *In re Terazosin Hydrochloride Antitrust Litigation,* 160 F.Supp.2d 1365 (S.D.Fla.2001), an antitrust action involving analogous allegations of delayed generic entry. There, the United States District Court for the Southern District of Florida allowed the defendants' motion to dismiss claims arising under the laws of states in which no named plaintiffs resided or purchased the branded drug. *Id.* at 1372. In doing so, the court explained that under Eleventh Circuit precedent, "a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Id.* (quoting *Griffin v. Dugger,* 823 F.2d 1476, 1483 (11th Cir.1987)); *accord Prado–Steiman ex rel. Prado v. Bush,* 221 F.3d 1266, 1279 (11th Cir.2000) (characterizing this requirement as "well-settled").

The lower courts in this circuit, however, are bound by no such precedent. Indeed, in *Mowbray v. Waste Management Holdings, Inc.,* 189 F.R.D. 194 (D.Mass.1999), this Court concluded that a single named plaintiff with a contract claim arising under the law of Illinois could adequately represent class members with similar claims arising under the laws of California, Georgia, Pennsylvania, Maryland, Michigan, New York, Texas, Virginia, and Wisconsin. *Mowbray,* 189 F.R.D. at 195, 199, 202. The First Circuit subsequently affirmed the certification order but did not specifically discuss the adequacy or standing of the named plaintiff. *See Waste Management Holdings, Inc. v. Mowbray,* 208 F.3d 288, 299 (1st Cir.2000).

The approach of *Mowbray* is consistent with that adopted by several other courts, which have interpreted Supreme Court precedent to direct consideration of class certification issues before those of standing, at least under certain circumstances. *See, e.g.,*

*Payton v. County of Kane,* 308 F.3d 673, 680, 682 (7th Cir.2002); *James v. City of Dallas,* 254 F.3d 551, 562 & n. 9 (5th Cir.2001); *In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 377 (S.D.N.Y.2002); *Clark v. McDonald's Corp.,* 213 F.R.D. 198, 204–05 (D.N.J.2003); *In re Pharmaceutical Industry Average Wholesale Price Litig.,* 263 F.Supp.2d 172, 193–94 (D.Mass.2003) (Saris, J.). These courts note that the Supreme Court's decision in *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), created an exception to ordinary jurisdictional principles for circumstances in which class certification is "logically antecedent to Article III concerns" and therefore "should be treated first." *Ortiz,* 527 U.S. at 831, 119 S.Ct. 2295 (quoting *Amchem,* 521 U.S. at 612, 117 S.Ct. 2231) (internal quotation marks omitted). The Supreme Court in *Amchem* characterized as "logically antecedent" issues that "would not exist but for the [class action] certification." *Amchem,* 521 U.S. at 612, 117 S.Ct. 2231 (alteration in original).

The Fifth and Seventh Circuits have interpreted *Ortiz* to favor a "nuanced approach" for consideration of standing challenges. Linda S. Mullenix, *Standing,* Nat'l L.J., June 16, 2003, at 43, col. 1.[7] In *Rivera v. Wyeth–Ayerst Laboratories,* 283 F.3d 315 (5th Cir. 2002), the Fifth Circuit described the *Ortiz* exception as applicable where class certification creates the jurisdictional issue. *Id.* at 319 n. 6. Where, however, "the standing question would exist whether [the class representative] filed her claim alone or as part of a class," the court "must decide standing first." *Id.* at 319 & n. 6; *accord Payton,* 308 F.3d at 680, 682 (7th Cir.2002) (noting that where "putative representatives were personally injured," *Ortiz* directs courts to "consider issues of class certification prior to issues of standing").

As between the conflicting approaches of the Eleventh Circuit on the one hand, and the Fifth and Seventh Circuits on the other, this Court adopts the latter, finding it more

---

7. Mullenix contrasts the "nuanced" approach of the Fifth and Seventh Circuits with the "restrictive" rule observed by other courts, which "prevents review of [all] standing challenges prior to the class certification decision." Mullenix, *su-*pra. Because this Court finds deferral of SmithKline's standing challenge appropriate even under the approach of the Fifth and Seventh Circuits, it need not address this distinction.

consistent with the policies of *Ortiz*, other Supreme Court decisions, and the class action rule. In *Payton*, the Seventh Circuit explained that *Ortiz* "rest[s] on the long-standing rule that, once a class is properly certified, statutory and Article III standing requirements must be assessed with reference to the class as a whole, not simply with reference to the individual named plaintiffs." *Payton*, 308 F.3d at 680. *Ortiz* thus builds upon the reasoning reflected in certain, but not all, of the Supreme Court's prior determinations of standing in class actions. *See* Jean Wegman Burns, *Standing and Mootness in Class Actions: A Search for Consistency*, 22 U.C. Davis L.Rev. 1239, 1240 (1989). In *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), for example, the Supreme Court established that an Article III controversy "may exist ... between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot." *Sosna*, 419 U.S. at 402, 95 S.Ct. 553; *accord United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 404, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980). *But see, e.g., Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) ("Petitioners must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."). The flexible inquiry described in *Sosna* and *Geraghty* acknowledges that in the "nontraditional" context of class actions, the purpose of the standing requirement—"limiting judicial power to disputes capable of judicial resolution" (that is, disputes involving "sharply presented issues in a concrete factual setting and self-interested parties vigorously advocating opposing positions")—may be served even absent a personal stake held by the named plaintiff. *Geraghty*, 445 U.S. at 396, 403, 100 S.Ct. 1202. The assurance of vigorous advocacy may be provided instead by the collective interest of the class, advanced by the named representative serving as a sort of "private attorney general." *See id.* at 403, 100 S.Ct. 1202. The focus of the standing inquiry is therefore appropriately directed toward the class rather than its representative.

This flexible, functional standing inquiry also proves consistent with the policies served by class action procedure. *See* Burns, *supra*, at 1287–88 (urging the Supreme Court "to acknowledge that the peculiar class-action beast requires a different, and more flexible, standing-and-mootness analysis"). The more traditional inquiry, which under the Eleventh Circuit's and SmithKline's interpretation, would require class counsel to identify representatives from each state involved in a multistate class action, would render class actions considerably more cumbersome to initiate, and in turn, less effective in overcoming a lack of incentives to prosecute individual rights and in "achiev[ing] economies of time, effort, and expense." *Amchem*, 521 U.S. at 615–17, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23 Advisory Committee's Note); *see also Gratz v. Bollinger*, 539 U.S. 244, 268 & n. 17, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003) (observing that the challenged class action, which involved a named representative with an arguably different claim but the "same set of concerns" as the members of the class, "save[d] the resources of both the courts and the parties") (alteration in original) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)); *Payton*, 308 F.3d at 681 (permitting named representatives to represent plaintiffs from other counties in part because "the class action device may be superior to 19, or 102, different cases in each Illinois county challenging the effects of the same state statute").

Here, adopting the approach of the Fifth and Seventh Circuits, the Court defers consideration of SmithKline's standing challenge until after certification of the end payor class. Certification is in this case "logically antecedent" because SmithKline's challenge would not arise but for the proposed certification. *Amchem*, 521 U.S. at 612, 117 S.Ct. 2231. Specifically, SmithKline did not challenge the representatives' standing to assert personal claims under the laws of states in which they resided or purchased medication. *See* Defs.' Opp'n at 34. Rather, SmithKline challenged only their standing to "represent a class of

indirect purchasers of Relafen in the other 16 Indirect Purchaser jurisdictions." *Id.* Accordingly, the Court applies the *Ortiz* exception to defer consideration of SmithKline's standing challenge and to address the remaining issues of certification first. *See Rivera*, 283 F.3d at 319 n. 6 (explaining that the *Ortiz* exception applies only when class certification "create[s] the jurisdictional issue"); *Clark*, 213 F.R.D. at 204–05 (deferring consideration of the argument that the plaintiff lacked standing to assert claims on behalf of class members regarding restaurants or states that he had not visited).

▪ Aside from standing, the end payor plaintiffs must establish the two parts of the adequacy inquiry: first, an absence of potential conflict and second, an assurance of vigorous prosecution. *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985). *But see* Linda S. Mullenix, *Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes* 19–23, 26–27 (unpublished manuscript) (advocating what the author concedes is a minority view: that in evaluating the adequacy of class representatives, courts should consider not only potential conflicts of interest, but also other characteristics including familiarity with the action, financial stake, and moral character). With respect to the first element, the Court notes that shortly after the parties submitted their memoranda and argued this motion, the Eleventh Circuit issued an opinion in *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181 (11th Cir.2003), a class action involving analogous allegations of delayed generic marketing. *See id.* at 1183–84. There, the Eleventh Circuit interpreted the adequacy requirement to preclude certification where evidence suggested that certain direct purchasers of the branded drug experienced a net economic benefit from the lack of generic competition while other direct purchasers did not. *Id.* at 1193. The court reasoned that

"this economic reality," while not relevant to the direct purchasers' standing to sue, was relevant to defining their "interests and objectives," which in that case were likely "divergent" from those of named representatives who experienced no net benefit. *Id.* at 1193.

Finding this reasoning persuasive, the Court concluded that the injured named representatives could not adequately represent the interests of class members who had not suffered similar economic injury.[8] The Court accordingly excluded from the end payor plaintiff classes "all persons or entities who suffered no economic harm as a result of SmithKline's alleged conduct." Order of 11/21/03, at 3 & n. 1. Such persons and entities include, for example, those who under the terms of their health insurance plans, owe the same co-payment for brand-name or generic drugs, or are reimbursed in full for all drug purchases. *See* Defs.' Opp'n at 14–15; *Cardizem*, 200 F.R.D. at 347 (excluding from an analogous class of indirect purchasers alleging delayed generic entry "[c]onsumers whose out-of-pocket expenditures do not vary with the cost of their prescription drugs" because they "cannot show that they suffered an economic injury").

The Court is aware of at least one decision, *Goda v. Abbott Laboratories*, No. 01445–96, 1997 WL 156541 (D.C.Super. Feb. 3, 1997), which reached a different conclusion regarding fixed co-pay and full reimbursement consumers. The *Goda* court rejected the argument that such consumers could not demonstrate economic injury, explaining that although "the injury is absorbed by the managed care plan or an insurance company," "there is nevertheless an injury." *Id.* at *9. The court referenced the collateral source rule applied to personal injuries, and reasoned that antitrust injuries should similarly fall upon defendants

---

**8.** The Court notes that *Valley Drug* identified a conflict between direct purchasers who benefit from generic delay versus those who were injured, a conflict arguably different from—and more serious than—that between end payors who were not injured by generic delay versus those who were. Indeed, in contrast to the direct purchasers of *Valley Drug,* the end payor plaintiffs here might be characterized as uniformly "not benefitted." Yet this superficial uniformity would not imply uniformity of economic interests. With respect to settlement, for example, an uninjured end payor might be willing to accept a far lesser sum than would an injured end payor with an entirely different economic situation.

rather than insured plaintiffs: "[I]t is better here to benefit the injured than the wrongdoer.... Effective enforcement of the antitrust laws is thus promoted." *Id.* Significantly, however, the *Goda* court also acknowledged that these insured consumers "deserve special and separate treatment" and divided the class accordingly. *Id.* The court indicated that the "collateral source problems" raised by the subclass of insured consumers would be "sorted out" at a later administrative stage. *Id.* at *9–*10.

In contrast to the plaintiffs in *Goda*, who moved to certify a class of consumers who purchased branded drugs "in the District," *id.* at *3, the end payor plaintiffs in the present action moved to certify a class of consumers who purchased Relafen or its generic equivalent "throughout the United States and its territories." End Payor Pls.' Mem. at 1. In light of the additional complexity and problems of manageability presented by the proposed multi-state class, *see Amchem*, 521 U.S. at 624, 117 S.Ct. 2231, the Court opted to exclude fixed co-pay and full reimbursement consumers from the exemplar classes rather than create subclasses requiring "separate scrutiny." *Goda*, 1997 WL 156541, at *9. This decision appears consistent with the rationales discussed in *Goda*. Because these classes, unlike that proposed in *Goda*, expressly include insurers as "third-party payors," Compl. ¶¶ 8–15, the Court was otherwise assured of benefits for the injured and effective antitrust enforcement. Moreover, as in *Valley Drug*, the Court's determination regarding certification of the exemplar classes did not affect the potential right of these consumers to recover individually or in a separate class action, *see Valley Drug*, 350 F.3d at 1193; *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 259 (D.Del.2002), although any recovery may be subject to claims for indemnification by their insurers.

The Court found more persuasive *Goda's* alternative argument that the insured consumer does in fact suffer injury, simply in the future rather than in the past: "[A]lthough copayments and/or premiums may be stabilized for one year, they will surely rise in the next to the detriment of the consumer/beneficiary." *Goda*, 1997 WL 156541, at

*9 n. 13. The Court nevertheless concluded that the injuries suffered by this class of insured consumers differed materially—in time, amount, and certainty—from those suffered by other members of the end payor plaintiff classes. *Cf. Amchem*, 521 U.S. at 626, 628, 117 S.Ct. 2231 (discussing the divergence between the goals and awareness of plaintiffs with current versus future asbestos claims); *Ortiz*, 527 U.S. at 856–59, 119 S.Ct. 2295 (explaining that *Amchem* requires structural protections against the conflicts arising between plaintiffs with claims arising in the past versus the future, and before versus after the expiration of the defendant's insurance policy). *But see Warfarin*, 212 F.R.D. at 259 (permitting fixed co-pay consumers to share in a settlement fund in light of two concerns not present here—the fact that the settlement would deprive the consumers of their right to seek injunctive relief, and the difficulty of providing, at that late stage, additional notice and an opportunity to opt-out). Consumers who felt "no pinch" from delayed generic entry, *Goda*, 1997 WL 156541, at *9, were therefore excluded from the end payor plaintiff classes.

In contrast, several other classes of end payors challenged by SmithKline were not excluded. SmithKline asserted that plaintiffs who purchased only branded Relafen—those who purchased Relafen before generic entry but purchased neither Relafen nor generic nabumetone after generic entry ("pre-generic purchasers"), and those who purchased Relafen both before and after generic entry ("brand loyalists")—suffered no injury. Defs.' Opp'n at 15–17. With respect to pre-generic purchasers, the end payor plaintiffs emphasized that patients "are bound by the limits of their doctor's prescription." End Payor Pls.' Reply at 17. Patients with prescriptions for Relafen were, prior to August 2001, limited to Relafen "because no substitute drug was on the market." *Id.* After August 2001, when generic substitutes entered the market, the end payor plaintiffs estimated that nearly 90 percent of Relafen sales were lost to generic nabumetone. End Payor Pls.' Reply at 11 (citing Rebuttal Declaration of Raymond S. Hartman ("Hartman Rebuttal Decl.") [Doc. No. 133] ¶ 26). Given the high likelihood of "switching," the Court

declined—at least at this preliminary stage— to exclude pre-generic purchasers, who were never presented with the opportunity to switch. The Court acknowledges that the amount of damages suffered by pre-generic purchasers is somewhat uncertain, but concludes that SmithKline overstated the uncertainty.[9] *See* Defs.' Proposed Order Opp'n at 4 ("There is simply no way of knowing whether such persons would have availed themselves of a generic alternative had one been on the market prior to August 2001 ....."). Moreover, the end payor plaintiffs alleged that even consumers who would not have switched, like the brand loyalists discussed below, suffered injury resulting from overcharges on Relafen. Any uncertainty accordingly concerns the amount rather than the fact of injury, and therefore should not preclude recovery, particularly where the uncertainty stems from delay that the end payor plaintiffs attribute to SmithKline's wrongful conduct. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981) ("[I]t does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." (citation and internal quotation marks omitted)).

In contrast to the purchases by pre-generic purchasers, the purchases of brand loyalists may reflect their "conscious choices."[10] End Payor Pls.' Proposed Order Reply at 155. For these consumers, health insurance plans again become relevant. If the amount that brand loyalists owed varied according to the price of Relafen—for example, insured brand loyalists who owed a percentage of the

price, and uninsured brand loyalists who owed the entire price—the end payor plaintiffs allege economic injury based on the allegedly inflated price of Relafen in the actual world. *See* End Payor Pls.' Resp. [Doc. No. 144] at 1 (citing Dr. Hartman's observation that "although brand prices still rise at retail, they do no rise as quickly as they had in the actual world, prior to generic launch"); *cf. In re Terazosin Hydrochloride*, No. 99–MDL–1317, 2004 WL 828997, at *18 (S.D.Fla. Apr. 8, 2004) (excluding all brand loyalists because the plaintiffs failed to establish that these consumers existed or had suffered an injury). Although SmithKline's expert vigorously contested the allegation of inflated prices, *see, e.g.,* Defs.' Opp'n at 16, the Court may not at this preliminary stage "weigh conflicting expert evidence or engage in 'statistical dueling' of experts." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir.2001).

If, on the other hand, the amount that brand loyalists owed did not vary according to the price of Relafen, but instead varied only with the choice between branded and generic drugs—for example, insured brand loyalists who owed a fixed copayment for branded drugs and a different fixed copayment for generic drugs—the end payor plaintiffs can identify no economic injury. For these brand loyalists, there was no difference between the cost associated with Relafen in the actual versus the but-for world. Brand loyalists whose direct costs did not vary according to the price of Relafen were accordingly excluded from the end payor plaintiff

---

**9.** The Court could imagine, for example, discounting the damages to account for the probability of non-switching.

**10.** The Court assumes that consumers who continued to choose Relafen in the actual world would have done so in the but-for world—that is, even if generic nabumetone had become available in August 1998 rather than August 2001. This assumption is admittedly imperfect: Consider, for example, consumers who continued purchasing Relafen after generic entry, but only because they were reluctant to switch after starting treatment with the branded drug. Had generic alternatives been available earlier, such consumers might have started with and continued purchasing generic nabumetone rather than

Relafen. The Court nevertheless excludes such consumers because identifying them would require the sort of individualized inquiries that would render class certification inappropriate. *See Cardizem*, 200 F.R.D. at 343 (distinguishing between switchers, for whom "[t]here is no need for individual analysis of switching behavior," and non-switchers, for whom there is such a need); *cf. Basic, Inc. v. Levinson*, 485 U.S. 224, 242, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (recognizing that requiring proof of an individualized issue such as reliance "effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones").

classes.[11] The test, as described above, is whether the end payor suffered economic injury as a result of SmithKline's alleged conduct.[12]

■ With the class limited as described above, the Court determined that no potential conflicts existed. With respect to the second element of the adequacy inquiry, the Court notes the considerable class action experience of the firms appointed co-lead counsel: Milberg Weiss Bershad Hynes & Lerach LLP; Spector, Roseman & Kodroff, P.C.; Miller Faucher and Cafferty LLP; and Heins Mills & Olson, P.L.C. At least one of these firms has represented classes of end payors in actions involving analogous claims of delayed generic entry. *See e.g., Warfarin,* 212 F.R.D. at 235 (listing Miller Faucher and Cafferty LLP among plaintiffs' counsel); *Cardizem,* 200 F.R.D. at 330 (same). Moreover, class counsel advocated vigorously in favor of its motion for certification. For these reasons, the Court concluded that the named representatives and their counsel would adequately protect the interests of the class. With the elements of Rule 23(a) thus established, the Court proceeds to consider the elements of Rule 23(b)(2) and (b)(3).

### D. Rule 23(b)(2)

Rule 23(b)(2) permits a class action when the Court may fashion "appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The plaintiffs asserted that SmithKline's "continuing unlawful acts of monopolization ... threaten continuing harm to all Class members," entitling them not only to damages, but also to an injunction preventing Smithkline from acquiring and maintaining a future monopoly. End Payor Pls.' Mem. at 6. SmithKline contended that this "ill-defined prayer,"—merely a "thinly veiled attempt to make an end run around *Illinois Brick* [*v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) ]"— was an inappropriate basis for certification "[b]ecause the redress plaintiffs seek is predominantly monetary." Defs.' Opp'n at 36–37.

■ As an initial matter, the lower courts that have addressed the issue have held that claims for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, do not undermine *Illinois Brick,* but rather fall properly outside its scope. *See e.g., Mid–West Paper Prods. Co. v. Continental Group,* 596 F.2d 573, 589–94 (3d Cir. 1979); *accord Lucas Automotive Eng'g, Inc. v. Bridgestone/Firestone, Inc.,* 140 F.3d 1228, 1234 (9th Cir.1998); *Campos v. Ticketmaster Corp.,* 140 F.3d 1166, 1172 (8th Cir.1998); *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1167 (5th Cir.1979). In *Illinois Brick,* the Supreme Court considered an antitrust action brought by governmental entities that had purchased concrete blocks indirectly from the manufacturer defendants. *Illinois Brick,* 431 U.S. at 726, 97 S.Ct. 2061 (explaining that the concrete blocks passed from the manufacturer to masonry contractors to general contractors before reaching the governmental entities). In rejecting the action for lack of standing, the Supreme Court interpreted Section 4 of the Clayton Act, 15 U.S.C. § 15, to prevent indirect purchasers from seeking antitrust damages except in certain limited circumstances. *See id.,* 431 U.S. at 728–29, 97 S.Ct. 2061. The Third Circuit subsequently concluded that the "indirect purchaser rule" of *Illinois Brick* does not apply to claims brought under Section 16 of the Clayton Act, which permits injured

---

**11.** A similar analysis applies to consumers who purchased only generic nabumetone. *See* Defs.' Proposed Order Opp'n at 4. Consumers whose costs varied according to the price of generic nabumetone were injured by what the end payor plaintiffs allege were artificially inflated prices. *See* End Payor Pls.' Mem. at 1. Consumers whose costs did not vary according to the price of generic nabumetone were not injured and were accordingly excluded from the end payor plaintiff classes.

**12.** Under this test, patients who were first prescribed Relafen after August 1998—the date of generic entry in the but-for world—were not excluded from the end payor plaintiff classes. That these patients might not have been prescribed Relafen in the but-for world, *see* Defs.' Opp'n at 19 (asserting a probable decline in prescriptions because SmithKline would have ceased its promotion of Relafen upon generic entry), does not change the fact that they were prescribed Relafen in the actual world and therefore suffered economic injury.

parties to seek injunctive relief rather than money damages. *See Mid–West Paper,* 596 F.2d at 594. The Third Circuit reasoned that the concerns motivating the indirect purchaser rule were simply inapplicable to claims for injunctive relief:

> Obviously, the risk of exposure to multiple liability, the difficulty in tracing the allocation of the overcharge among different levels of purchasers, and the general desirability of symmetrical application of the pass-on theory to plaintiffs and defendants are wholly unrelated to the issue whether a party should be entitled to sue for injunctive relief. Nor does the position taken in *Illinois Brick,* that effective enforcement of the antitrust laws requires that only direct purchasers be permitted to sue for treble damages, have validity in the context of [§ ] 16.... With respect to injunctive relief, ... the entitlement of one group to sue does not diminish the incentive of another group to sue.

*Id.* at 592.[13] If applied here, the Third Circuit's reasoning would permit the end payor plaintiffs to assert their claim for injunctive relief notwithstanding their status as indirect purchasers. *See Relafen,* 218 F.R.D. at 344 (explaining that branded drugs typically pass from manufacturers to pharmaceutical wholesalers and then to end payors).

■ Yet even assuming their standing, the end payor plaintiffs must also demonstrate "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The Supreme Court has held that this requirement is satisfied by a showing of "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Here, however, the end payor plaintiffs alleged a violation of the antitrust laws based on SmithKline's "obtaining, and continually listing with the Food and Drug Administration, a fraudulent and unenforceable patent," bringing "objectively

baseless patent infringement suits," and "block[ing] generic nabumetone tablets from the market." End Payor Pls.' Mem. at 1. Each of these activities has terminated. Specifically, SmithKline's patent has been declared invalid, its infringement suits have been terminated with judgment for the defendants, and generic nabumetone tablets have entered the market. *See SmithKline Beecham,* 45 Fed.Appx. at 917; End Payor Pls.' Mem. at 1. Under these circumstances, it is difficult to imagine how Smithkline's violation might recur. *See also* Greenhalgh Decl. ¶ 13 (discussing additional competition from a new type of branded anti-inflammatory drug). Nor have the end payor plaintiffs asserted other violations that might "fairly be anticipated from the defendant's conduct." *Zenith Radio,* 395 U.S. at 132, 89 S.Ct. 1562 (quoting *NLRB v. Express Publishing Co.,* 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941)) (internal quotation marks omitted). For this reason, the Court found injunctive relief inappropriate. *See id.* at 133, 89 S.Ct. 1562 (explaining that while a district court may restrain related unlawful acts, it "may not enjoin all future illegal conduct of the defendant, or even all future violations of the antitrust laws"). The end payor plaintiff's motion for class certification was accordingly DENIED with respect to Rule 23(b)(2).

### E. Rule 23(b)(3)

Certification under Rule 23(b)(3) requires that common questions "predominate" over individual questions, such that class treatment is "superior" to other methods of resolution. Fed.R.Civ.P. 23(b)(3); *see also Tardiff v. Knox County,* 365 F.3d 1, 4–5 (1st Cir.2004) (describing subsection (b)(3) as "the cute tiger cub that has grown into something unexpectedly fearsome in civil rights and mass tort litigation"). The Court begins its discussion with predominance, the requirement SmithKline most vigorously contests.

#### 1. Predominance

To establish predominance under Rule 23(b)(3), the end payor plaintiffs must dem-

---

**13.** In a more recent decision, the Supreme Court explained, consistent with the Third Circuit's view, that the indirect purchaser rule is applied to claims for money damages to "eliminate the complications of apportioning overcharges,"

"eliminate multiple recoveries," and "promote the vigorous enforcement of the antitrust laws." *Kansas v. UtiliCorp United, Inc.,* 497 U.S. 199, 208, 212, 214, 110 S.Ct. 2807, 111 L.Ed.2d 169 (1990).

onstrate that the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 623, 117 S.Ct. 2231. The First Circuit has held that this requirement is satisfied where, notwithstanding individualized concerns, "a sufficient constellation of common issues binds class members together." *Waste Management,* 208 F.3d at 296; *accord Smilow,* 323 F.3d at 39 (1st Cir.2003) ("After all, Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class."). The end payor plaintiffs asserted that their unjust enrichment and antitrust claims focused primarily on common issues, specifically SmithKline's conduct, SmithKline's profits, and the classes' aggregate damages. End Payor Pls.' Mem. at 7–16. Accordingly, the end payors contended, these common issues predominated. *Id.* SmithKline challenged this contention as too simplistic, citing "overwhelming" individualized and complex questions regarding impact and governing state law. Defs.' Opp'n at 13–33.

### a. Impact

As an initial matter, the Court emphasizes that the end payor plaintiffs' claims for damages and restitution arise solely under state law. Compl. ¶¶ 3–4. In contrast to federal antitrust law, *see Illinois Brick,* 431 U.S. at 728–29, 97 S.Ct. 2061, certain state antitrust and consumer protection laws permit indirect purchasers to assert claims for damages. Each of the twelve states listed in the end payor plaintiffs' proposed order authorizes such suits, under statutes either passed explicitly to repeal *Illinois Brick,* or interpreted to depart from it. *See* Notice of Proposed Order [Doc. No. 150], Schedule B; Kevin J. O'Connor, *Is the Illinois Brick Wall Crumbling?,* 15 Antitrust 34, at 34–35 & nn. 3–4 (Summer 2001) (listing the thirty-six states that "provide for some sort of right of action on behalf of some or all indirect purchasers."). The Supreme Court has recognized this type of state statute as independent of, and not preempted by, federal antitrust law. *See California v. ARC America Corp.,* 490 U.S. 93, 101–02, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989). The Supreme Court has stated further that "no clear purpose of Congress" indicates that the states are barred from imposing antitrust liability "over and above that authorized by federal law." *Id.* at 105, 109 S.Ct. 1661. There may, however, be state policies against such double recovery. *See, e.g., Bunker's Glass Co. v. Pilkington PLC,* 206 Ariz. 9, 75 P.3d 99, 108 (2003).

Under both federal and state law, the essential elements of a private antitrust action are the same: proof of a violation by the defendant, a demonstration of injury to the plaintiff, and an approximation of the plaintiff's damages. *See, e.g., Bell Atlantic Corp. v. AT & T Corp.,* 339 F.3d 294, 302 (5th Cir.2003) (discussing the elements necessary to demonstrate civil liability under federal law); *Bunker's Glass,* 206 Ariz. 9, 75 P.3d at 102 (affirming the substantive parallels between federal law and Arizona law). Here, as in many antitrust class actions, the nature of the first and third elements was not in serious dispute. The alleged antitrust violation relates solely to SmithKline's conduct, and as such, constitutes a common issue subject to common proof. *See Bell Atlantic,* 339 F.3d at 302 ("Proof of these elements [of an antitrust violation] will necessarily be identical for the members of both proposed classes ....."); *In re Lorazepam & Clorazepate Antitrust Litig.,* 202 F.R.D. 12, 29 (D.D.C.2001) ("As is true in many antitrust cases, the alleged violations of the antitrust laws at issue here respecting price fixing and monopolization relate 'solely to Defendants' conduct, and as such proof for these issues will not vary among class members.'" (quoting *In re Potash Antitrust Litig.,* 159 F.R.D. 682, 694 (D.Minn.1995))). In contrast, the amount of class members' damages depends in part upon the amount of Relafen or generic nabumetone purchased, and as such, is an individualized issue requiring individualized proof. *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."); *Smilow,* 323 F.3d at 40 (citing *Blackie* as an example of courts' general willingness to "find the predominance requirement to be satisfied even if individual damages issues remain").

In relation to the first and third elements discussed above, the second element of the

end payor plaintiffs' action—a demonstration of injury—requires closer scrutiny. On the one hand, each class member has, by definition, both "purchased and/or paid for Relafen® (known generically as nabumetone) or generic versions of Relafen®," and suffered resulting economic harm. Proposed Order at 1. The end payor plaintiffs alleged that overcharges on Relafen and nabumetone can be demonstrated through "generalized evidence," including a government study of the pharmaceutical industry, SmithKline's statements regarding competition between branded and generic drugs, empirical data regarding the prices of Relafen and generic nabumetone, and expert testimony interpreting the industry and market data. *See* End Payor Pls.' Reply at 7–12. Except as it applies to those consumers excluded above, who experienced no economic harm from SmithKline's alleged conduct, *see* Defs.' Opp'n at 14–17, the end payor plaintiffs' assertion of common injury appears persuasive. Several courts have found or presumed class-wide injury cognizable under federal law under analogous circumstances. *See, e.g., Visa Check/MasterMoney*, 280 F.3d at 137–38 (affirming the district court's determination that injury could be proven on a class-wide basis where "every single class member[ ] overpa[id] for off-line debit cards"); *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 455 (3d Cir.1977) ("If, in this case, a nationwide conspiracy is proven, ... an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price.").

Yet even assuming that these decisions interpreting federal antitrust law would be otherwise persuasive, *but see, e.g.,* 7B Wright, Miller & Kane, *supra*, § 1781 (cautioning that "although many courts have certified antitrust suits under Rule 23(b)(3), certification is not always appropriate"), the Court must examine the end payor plaintiffs' claims under governing state law. As emphasized above, state law defines the elements of the end payor plaintiffs' claims and in turn, proves relevant to determining the demonstration of common injury necessary for certification. *See* William H. Page, *The Limits of Indirect Purchaser Suits: Class Certification in the Shadow of Illinois Brick,* 67 Antitrust L.J. 1, 27 (1999); *cf. Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir.1977) (rejecting class-wide proof of damages as inconsistent with the terms of the Clayton Act). The Court accordingly turns to SmithKline's second and related objection: that "significant variations" in state law predominate here. Defs.' Opp'n at 25; *see also Castano v. American Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996) (concluding that the district court erred by failing to consider how variations in state law affected predominance and superiority).

### b. Governing State Law

The Court begins by acknowledging that federal appellate courts have viewed class actions governed by the law of multiple states with serious skepticism. *See, e.g., In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir.2002) (collecting cases in which the Seventh Circuit has held that certification of a nationwide class was inappropriate due to variations in states' laws governing warranties, fraud, and products liability); *In re American Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir.1996) (characterizing the task of instructing a jury as "impossible" where state laws differ). The end payor plaintiffs offered two responses, however.

First, they contended that "[b]ecause SKB is based in Pennsylvania, the Court could also apply Pennsylvania law to the entire Class." End Payor Pls.' Mem. at 8 n. 9. Because state antitrust, consumer protection, and unjust enrichment laws vary on such issues as prohibited practices and limitations periods, *see,* Section III.E.1.b.ii-iv, *infra,* this Court must determine if Pennsylvania has a "significant contact or significant aggregation of contacts" to this litigation that would justify the application of its law over the various laws of other states. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981) (plurality opinion)). Clearly, Pennsylvania has a sub-

stantial connection to SmithKline and some, though not all, of its alleged conduct. *See* End Payor Pls.' Mem. at 1 (discussing, in addition to internal strategizing, which presumably took place in Pennsylvania, SmithKline's prosecution, listing, and enforcement of the '639 patent, which took place in Washington, D.C. and Massachusetts); *see also In re Bridgestone/Firestone Inc. Tires Products Liability Litig.*, 205 F.R.D. 503, 513 (S.D.Ind.2001) (applying the laws of the defendants' principal places of business, in which substantial conduct relevant to the plaintiffs' products liability and breach of warranty claims took place), *rev'd sub nom. In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012. Yet the primary aim of antitrust and consumer protection laws generally—and those of indirect purchaser states particularly—is compensating consumers, not policing corporate conduct. *See, e.g., Bunker's Glass*, 206 Ariz. 9, 75 P.3d at 110 (choosing to "afford greater protection to Arizona citizens [than federal law does]" by recognizing indirect purchaser standing under the state's antitrust statute); *Ciardi v. F. Hoffmann–La Roche, Ltd.*, 436 Mass. 53, 66–67, 762 N.E.2d 303 (2002) ("We read the language of G.L. c. 93A as a clear statement of legislative policy to protect Massachusetts consumers through the authorization of such indirect purchaser actions."); Restatement (Second) of Conflict of Laws § 6(2) (1971) (listing "the basic policies underlying the particular field of law" among the factors relevant to a choice of law). Accordingly, the Court considers the more significant contact in this context to be the location of the injury—that is, the location of the sales to the end payor plaintiffs.

By definition, the sales at issue in this litigation did not involve SmithKline or its Pennsylvania location. *See* Proposed Order at 1 (excluding from the proposed class persons or entities who purchased Relafen or its generic equivalents directly from SmithKline). Rather, many—if not most—of the relevant sales took place wholly outside Pennsylvania, between out-of-state direct purchasers, *see Valley Drug*, 350 F.3d at 1191 & n. 18 (identifying the three existing national wholesalers, two of which are headquartered outside Pennsylvania, and noting that the national wholesalers' purchases constituted more than fifty percent of the plaintiff class's claims), and out-of-state end payors. Applying Pennsylvania law to these wholly out-of-state transactions would be at best a "novelty," and at worst a violation of constitutional limitations. *Bridgestone/Firestone*, 288 F.3d at 1016; *Shutts*, 472 U.S. at 822, 105 S.Ct. 2965; *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir.1997) (stating that under federal constitutional limits, "[a] state cannot regulate sales that take place wholly outside it.").

In the alternative, the end payor plaintiffs argue that "[e]ven if the law of multiple states must be applied, the laws governing the classes' antitrust, consumer protection, and unjust enrichment claims reveal 'no significant conflict.'" End Payor Pls.' Mem. at 17. As an initial matter, the Court must determine whether the "law of multiple states" must in fact be applied. Both Massachusetts and Pennsylvania[14] have adopted a flexible or "functional choice of law approach," under which courts consider "the interests of the parties, the States involved, and the interstate system as a whole." *Bushkin Assoc., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985); *see Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 21–23, 203 A.2d 796 (1964) (permitting "analysis of the policies and interests underlying the particular issue before the court"). As stated above, "the basic policies underlying the particular field of law," Restatement, *supra*, § 6(2)(e); *see Griffith*, 416 Pa. at 24, 203 A.2d 796 (considering the policies that "apparently underlie" the conflicting statute), are those of consumer protection, suggesting that any balancing of the parties' contacts or expectations, *see* Restatement, *supra*, § 6(2)(d), should be weighted toward those of

---

14. One of the cases consolidated in this action was transferred from the Eastern District of Pennsylvania, *see Twin Cities Bakery Workers Health & Welfare Fund v. SmithKline Beecham Corp.*, No. 02–CV–985 (E.D. Pa. filed 2002), and therefore requires application of Pennsylvania's choice of law rules. *See Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964).

consumers. The location of consumers' purchases thus assumes special significance. Appropriate consideration must also be given to the "relative interests of ... states." Restatement, *supra*, § 6(2); *see Griffith*, 416 Pa. at 24, 203 A.2d 796 (comparing the interests of the place of injury and the domicile of the defendant). States have a strong interest in protecting consumers with respect to sales within their borders, *see, e.g., Bunker's Glass*, 206 Ariz. 9, 75 P.3d at 109 (discussing the protection from anti-competitive practices guaranteed to Arizona citizens by the state constitution), but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states, *see BMW of North America, Inc. v. Gore*, 517 U.S. 559, 571, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ("[I]t is clear that no single State could ... impose its own policy choice on neighboring States."). For these reasons, the Court concluded that Massachusetts and Pennsylvania choice of law rules would select the various states in which consumers' purchases were made, rather than Pennsylvania law.

This fact alone, however, does not necessarily defeat certification. Indeed, this Court has previously certified a class of plaintiffs whose claims were governed by the laws of several states. *Mowbray*, 189 F.R.D. at 202. In doing so, the Court rejected the defendant's argument that differences in the states' statutes of limitations would predominate over common issues. *Id.* at 200. On appeal, the First Circuit affirmed, stating that the individualized limitations determinations were relevant but not necessarily fatal to certification. *Waste Management*, 208 F.3d at 296 (noting that the Court "acknowledged the lack of uniformity, and explained why the limitations problems nonetheless appeared to be inconsequential"). As it did in *Mowbray*, the Court proceeds to consider

whether variations in state law are sufficiently significant to negate predominance. *Mowbray*, 189 F.R.D. at 199–201. In light of its previous statements to counsel and the subsequent proposed order, *see* 10/23/03 Hr'g Tr. at 30, the Court limits its consideration to the twelve states suggested as "Exemplar States": Arizona, California, Florida, Kansas, Maine, Massachusetts, Michigan, Minnesota, New York, North Carolina, Tennessee, and Vermont. Proposed Order at 1.

## A. Standing

As stated above, each of the exemplar states permits indirect purchaser actions under its antitrust, consumer protection, or unfair trade practices statutes.[15] *See Bunker's Glass*, 206 Ariz. 9, 75 P.3d 99, 102; Cal. Bus. & Prof.Code § 17203; *Mack v. Bristol-Myers Squibb Co.*, 673 So.2d 100, 103 (Fla. Dist.Ct.App.1996); Kan. Stat. Ann. §§ 50–624(j), 50–626(a);[16] Me.Rev.Stat. Ann. tit. 10, § 1104(1); *Ciardi*, 436 Mass. at 58–59, 762 N.E.2d 303; Mich. Comp. Laws Ann. § 445.778(2); Minn.Stat. Ann. § 325D.57; N.Y. Gen. Bus. Law § 349(h); *Hyde v. Abbott Labs., Inc.*, 123 N.C.App. 572, 584, 473 S.E.2d 680 (1996); *Blake v. Abbott Labs., Inc.*, C.A. No. 03A01–9509–CV–00307, 1996 WL 134947, at *4 (Tenn.Ct.App. Mar. 27, 1996); Vt. Stat. Ann. tit. 9, § 2465(b). With respect to substantive matters—as opposed to procedural concerns such as standing—these state statutes uniformly parallel their federal counterparts, the Sherman Act and the Federal Trade Commission Act. *See Bunker's Glass*, 206 Ariz. 9, 75 P.3d at 106; *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 185, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999); *Mack*, 673 So.2d at 104 (Fla.Dist.Ct.App.1996); *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1081 (1st Cir.1993) (Maine) (noting the manner in which "[t]he Maine anti-

---

**15.** The fact that the exemplar states have recognized indirect purchaser actions brings the present claims out from under "[t]he [l]ong [s]hadow of *Illinois Brick*." *Terazosin*, 160 F.Supp.2d at 1372. Unlike states that have adopted the *Illinois Brick* prohibition, the exemplar states have not expressed a policy against indirect purchaser actions that might otherwise be undermined by the end payor plaintiffs' present claims.

**16.** *See Cole v. Hewlett Packard Co.*, 84 P.3d 1047, 2004 WL 376471, at *6 (Kan.App.2004) (unpublished table decision) ("Based on the plain wording of K.S.A.2003 Supp. 50–624(j), Cole, the consumer, did not need to deal directly with HP, the supplier, for the sale of the 882C printer in order for her and HP to be involved in a consumer transaction. As a result, this transaction falls within the KCPA [Kansas Consumer Protection Act].").

trust statutes parallel the Sherman Act"); Mass. Gen. Laws ch. 93A, § 2(b); Mich. Comp. Laws Ann. § 445.778 Mich. cmt.; *Minnesota Twins Partnership v. State ex rel. Hatch,* 592 N.W.2d 847, 851 (Minn.1999); R. Givens, *Practice Commentaries,* N.Y. Gen. Bus. Law § 349 (McKinney's 1996); *Hyde,* 123 N.C.App. at 584, 473 S.E.2d 680; Tenn.Code Ann. § 47–18–115; Vt. Stat. Ann. tit. 9 § 2453(b). As SmithKline notes, the remedies available under the state statutes differ, Defs.' Opp'n at 27–30, but "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)." *Smilow,* 323 F.3d at 40. Nor do the individual damages issues appear "especially complex or burdensome," at least not with respect to the five exemplar states listed in the Court's certification order. Order of 11/21/03; *see* Ariz.Rev.Stat. § 44–1408B, Mass. Gen. Laws ch. 93A, § 11, Vt. Stat. Ann. tit. 9, § 2465 (permitting the recovery of up to treble damages, plus fees and costs, if available, as determined by the court); Cal. Bus. & Prof.Code § 17203, *Browder v. Hite,* 602 S.W.2d 489, 492 (Tenn.App.1980) (establishing restitution as the appropriate remedy for unfair competition under California law and unjust enrichment under Tennessee law).

In addition to these statutory causes of action, each of the exemplar states recognizes a cause of action for unjust enrichment. *Murdock–Bryant Constr., Inc. v. Pearson,* 146 Ariz. 48, 52, 703 P.2d 1197 (1985); *First Nationwide Sav. v. Perry,* 11 Cal.App.4th 1657, 1662, 15 Cal.Rptr.2d 173 (1992); *Hillman Const. Corp. v. Wainer,* 636 So.2d 576, 577 (Fla.Dist.Ct.App.1994); *A.F.A.B., Inc. v. Town of Old Orchard Beach,* 610 A.2d 747, 749 (Me.1992); *Keller v. O'Brien,* 425 Mass. 774, 778, 683 N.E.2d 1026 (1997); *Kammer Asphalt Paving Co. v. East China Township Sch.,* 443 Mich. 176, 185, 504 N.W.2d 635 (1993); *Youngstown Mines Corp. v. Prout,*

266 Minn. 450, 475–76, 124 N.W.2d 328 (1963); *Parsa v. New York,* 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235 (1984); *Booe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554 (1988); *Paschall's, Inc. v. Dozier,* 219 Tenn. 45, 54, 407 S.W.2d 150 (Tenn.1966); *Legault v. Legault,* 142 Vt. 525, 531, 459 A.2d 980 (1983). Such actions rest on the equitable principle that "[a] person who is unjustly enriched at the expense of another is required to make restitution to the other." Restatement (Third) of Restitution and Unjust Enrichment § 1. Consistent with this principle, claims for unjust enrichment share a core of common elements:[17] the plaintiff conferred a benefit upon the defendant, the defendant appreciated or knew of the benefit, and the defendant accepted or retained the benefit under such circumstances as to make non-payment inequitable. *See City of Sierra Vista v. Cochise Enters., Inc.,* 144 Ariz. 375, 381, 697 P.2d 1125 (Ariz.Ct.App.1984); *Lectrodryer v. SeoulBank,* 77 Cal.App.4th 723, 726, 91 Cal.Rptr.2d 881 (2000); *Hillman Construction,* 636 So.2d at 577 (Fla.Dist.Ct. App.1994); *J.W. Thompson Co. v. Welles Prods. Corp.,* 243 Kan. 503, 512, 758 P.2d 738 (1988); *A.F.A.B.,* 610 A.2d at 749 (Me.1992) (quoting *Estate of White,* 521 A.2d 1180, 1183 (Me.1987)); *Keller,* 425 Mass. at 778, 683 N.E.2d 1026; *B & M Die Co. v. Ford Motor Co.,* 167 Mich.App. 176, 181, 421 N.W.2d 620 (1988); *First Nat'l Bank of St. Paul v. Ramier,* 311 N.W.2d 502, 504 (Minn.1981); *Lake Minnewaska Mountain Houses Inc. v. Rekis,* 259 A.D.2d 797, 798, 686 N.Y.S.2d 186 (N.Y.App.Div.1999); *Booe,* 322 N.C. at 570, 369 S.E.2d 554; *Browder,* 602 S.W.2d at 492; *Morrisville Lumber Co. v. Okcuoglu,* 148 Vt. 180, 184, 531 A.2d 887 (1987). Although claims for unjust enrichment often accompany and supplement those for breach of contract, they may also—as here—accompany and supplement those for tortious injury.

---

**17.** To be sure, there are variations in states' definitions of unjust enrichment. As examples, SmithKline cites differences in the conduct required and the availability of equitable defenses. *See* Defs.' Opp'n at 31–32. Yet with the exception of the variation discussed below, *see* Section III.E.1.b.v, *infra,* such differences prove largely irrelevant. As the end payor plaintiffs note, the conflict between states that require illegal conduct and those that do not is "immaterial ...

because Plaintiffs here do allege unlawful conduct." End Payor Pls.' Reply at 32. Similarly, although states may "vary significantly in the requirements necessary to establish the defense [of unclean hands]," *Lilly v. Ford Motor Co.,* No. 00 C 7372, 2002 WL 507126, at *2 (N.D.Ill. Apr. 3, 2002) (citation omitted), there is no suggestion here that SmithKline could establish any set of relevant requirements.

*See* Restatement (Third) of Restitution § 3 ("A person who interferes with the legally protected rights of another, acting without justification and in conscious disregard of the other's rights, is liable to the other for any profit realized by such interference.").

Notwithstanding these commonalities, the laws of certain exemplar states incorporate variations that counsel against certification. These variations are the subject of the discussion below. As a general matter, the Court considered statutory and common law claims asserted under the laws of the same state as a pair. Accordingly, if variations between state laws required excluding statutory claims raised under the laws of State *A*, equitable claims raised under the laws of State *A* were also excluded. The Court concluded that a contrary approach would be inconsistent with the requirements of adequacy and superiority. To the extent that a judgment in this action would be claim preclusive, including State *A* equitable claims would effectively waive State *A* statutory claims, raising adequacy concerns for end payors who might prefer to litigate their statutory claims individually or as part of a State *A* class. *See Clement v. American Honda Fin. Corp.*, 176 F.R.D. 15, 23–24 (D.Conn.1997) (denying certification where as a condition of class treatment, members were forced to forego their claims for unfair trade practices and minimum statutory damages); *see also* David A. Dana, *"Adequacy of Representation" in Time* 3 (Apr.2004) (unpublished manuscript) (urging courts to evaluate adequacy in class action settlements by examining the relief that a class member receives "in return for ceding her legal claims"). To the extent that a judgment in this action would not be claim preclusive, including State *A* equitable claims would leave open the possibility of individually litigating State *A* statutory claims, suggesting that individual actions, or more likely, a class action limited to State *A* end payors, would provide more complete and efficient resolution.

## B. Individual Injury

As stated above, the second element of the end payor plaintiffs' antitrust claims—demonstration of injury—warrants special scrutiny. State courts have differed significantly in their consideration of this element, prompting one commentator to observe: "The most important determinant of class certification of indirect purchaser suits appears to be where the suit is filed." Page, *supra*, at 21; *compare, e.g., Bellinder v. Microsoft Corp.*, Nos. 00–C–0855, 00–C–00092, 99CV17089, 2001 WL 1397995 (Kan.Dist.Ct. Sept. 7, 2001), *with A & M Supply Co. v. Microsoft Corp.*, 252 Mich.App. 580, 654 N.W.2d 572 (Mich.App.2002) (granting and denying, respectively, certification of virtually identical classes of indirect purchasers based on virtually identical evidence including affidavits submitted by the same opposing experts). Differences in state certification decisions reflect, at least to some degree, differences in substantive state law. *See* Page, *supra*, at 27 (explaining that a court's approach to certification of indirect purchaser classes "may depend in part on the nature of the jurisdiction's indirect purchaser statute"). The *Goda* court, for example, certified a class of indirect purchasers after noting that the District of Columbia Antitrust Act explicitly provides for class-wide proof of injury: "[T]he fact of injury and the amount of damages sustained by members of the class may be proven on a class-wide basis, without requiring proof of such matters by each individual member of the class." *Goda*, 1997 WL 156541, at *5 (quoting D.C.Code Ann. § 28–4508(c)).

In contrast, several other courts have denied class certification after concluding that their states' indirect purchaser statutes, unlike the District of Columbia's, require proof of injury to each class member. In *Execu–Tech Business Systems, Inc. v. Appleton Papers Inc.*, 743 So.2d 19 (Fla.Dist.Ct.App. 1999), the Florida District Court of Appeal affirmed the denial of certification where the plaintiffs "had failed to meet their burden to come forward with a methodology by which they would be able to show by generalized proof that the alleged price-fixing conspiracy had impacted each class member individually." *Id.* at 21–22. The *Execu–Tech* plaintiffs' proposed methodology, an "incidence analysis" performed by an expert economist, was rejected by the court below as dependent on "simplifying assumptions that have

little support in the real world." *Execu–Tech,* 743 So.2d at 22 (internal quotation marks omitted); *compare In re Florida Microsoft Antitrust Litig.,* No. 99–27340, 2002 WL 31423620, at *11 (Fla.Cir.Ct. Aug. 26, 2002) (permitting certification where, unlike *Execu–Tech,* the conclusions of the plaintiffs' economist were supported by those of other experts, including economists employed by the Department of Justice during the previous action brought by the United States, who also identified methodologies for demonstrating the individual impact of Microsoft's behavior).

In *Melnick v. Microsoft Corp.,* Nos. CV–99–709, CV–99–752, 2001 WL 1012261 (Me.Super. Aug. 24, 2001), the Maine Superior Court similarly declined to certify a proposed class of indirect purchasers. *Id.* at *16. Noting that Maine's indirect purchaser statute "does not change the plaintiffs' burden of proof on a motion for class certification," the court required "an entirely separate level of evidence and proof" demonstrating that overcharges had been passed on to consumers. *Id.* at *6 & n. 7 (citing *Karofsky v. Abbott Laboratories, Inc.,* CV–95–1009, 1997 Me.Super. LEXIS 316 (Oct. 15, 1997), which rejected expert testimony regarding impact as uncertain and incomplete). The court determined the plaintiffs had failed to produce such evidence, relying on "general, untried economic theory" rather than "real world facts" regarding Maine consumers. *Id.* at *16.

Michigan courts have declined to certify indirect purchaser classes on four occasions. *See A & M Supply,* 252 Mich.App. at 616–32, 654 N.W.2d 572 (reviewing the certification decisions of Michigan trial courts). The Appeals Court in *A & M Supply* gathered from prior denials that "Michigan's trial courts tend to interpret MARA [Michigan Antitrust Reform Act] and our state court rules as requiring a rigorous analysis" of individual impact. *Id.* at 635, 654 N.W.2d 572. The *A & M* court agreed with this approach, holding that it was "mandate[d]" by MARA's requirement of "actual damages." *Id.* The court accordingly rejected the affidavits sworn by the plaintiffs' expert, whose methodologies "failed to bridge the gap between economic theory and the reality of economic damages." *Id.* at 640, 654 N.W.2d 572. Citing what Judge Posner termed the "central insight of *Illinois Brick*"—that the proportion of pass-on will be difficult to determine in imperfect markets—the Court found the expert's theories, "generalized slogans," and "vague promises for future analysis" simply insufficient to meet the plaintiffs' burden. *Id.* at 638–42, 654 N.W.2d 572 (quoting *Illinois ex rel Hartigan v. Panhandle Eastern Pipe Line Co.,* 852 F.2d 891, 894 (7th Cir. 1988), *overruled on other grounds sub nom. Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.,* 935 F.2d 1469 (7th Cir.1991)). *But see Cardizem,* 200 F.R.D. at 349–51 (concluding, on the basis of exclusively federal decisions, that a lesser burden applied to a class of indirect purchasers asserting claims under Michigan law).

In *Gordon v. Microsoft Corp.,* No. 00–5994, 2001 WL 366432 (Minn.Dist.Ct. Mar. 30, 2001), the Minnesota District Court noted the "consistency" with which Minnesota courts have denied class certification motions in indirect purchaser cases. *Id.* at *4 (citing five such denials). In *Keating v. Philip Morris, Inc.,* 417 N.W.2d 132 (Minn.App.1987), for example, the Court of Appeals agreed that class certification was inappropriate where the calculation of cigarette retailers' individual damages presented an "unmanageable, if not impossible, task." *Id.* at 137. The court foresaw "thousands of trials" examining "hundreds of thousands of transactions between thousands of retailers, wholesalers, distributors and manufacturers." *Id.* In *Gordon,* apparently the only Minnesota decision to certify a class of indirect purchasers, 2001 WL 366432, at *2, the court considered its case "different" from "each of the prior cases," in which plaintiffs had "failed to propose a viable method for proving class-wide fact of injury, amount of individual damages, or both," *id.* at *6 (internal citations omitted). Unlike those plaintiffs, the plaintiffs in *Gordon* had "actually produced a time-consuming but apparently workable method for calculating damages." *Id.* More importantly, the *Gordon* court declared at the beginning of its analysis that "standards for class certification should be interpreted if at all possi-

ble in a fashion that indirect purchasers can meet." *Id.* at *4.

The above decisions suggest that these courts have interpreted their respective indirect purchaser statutes with a more "skeptical view" of antitrust policies and remedies. *See* Page, *supra,* at 17.[18] As Professor Page has explained: "The skeptical view, typified by the *Illinois Brick* majority, values deterrence over compensation, efficiency over equity, and accuracy over approximation." *Id.* Courts adopting this view question their ability to apportion overcharges between direct and indirect purchasers, finding that "the realities of the evidentiary issues, as opposed to theoretical models, are difficult for courts to resolve accurately." *Id.* Finding these decisions a persuasive "indication of what state law is," 19 Wright, Miller & Cooper, *supra,* § 4507, the Court concludes that the indirect purchaser statutes of Florida, Maine, Michigan, and Minnesota require a somewhat stronger and more precise showing of individual impact. *But see Terazosin,* 2004 WL 828997, at *25, *28 (certifying classes of indirect purchasers from Florida, Maine, Michigan, and Minnesota without reference to or analysis of state court interpretations of their respective statutes).

The end payor plaintiffs have not made such a showing. Rather, they rely on the declarations of Raymond S. Hartman ("Dr. Hartman"), an economist who proposes methodologies "potentially available to calculate damages of the Class on an aggregate basis." End Payor Pls.' Mem. at 15. Specifically, Dr. Hartman discusses the "top-down" method, which would trace but-for and actual prices from SmithKline down to end payors, the "bottom-across" method, which would compare but-for and actual prices paid by end payors at the bottom of the distribution chain, and a hybrid version "making use of the most reliable components of each method." Hartman Decl. ¶ 23. Although these methods are "aimed at estimation of aggregate class-wide overcharge damages," Dr. Hartman asserts that they can also be applied to specific groups or individuals to "differentiat[e] and allocat[e] damages." *Id.* ¶ 25. He does not, however, go further toward differentiating or allocating damages based on, for example, the unique characteristics of various states' markets or consumers. In fact, in response to SmithKline's objection, Dr. Hartman states: "It is my understanding that the formulaic methods ... must provide a sufficiently accurate calculation of *aggregate* damages. At this stage of the litigation, it is *unnecessary* that I calculate *individual* damages to each and every Class member." Hartman Rebuttal Decl. ¶ 10 (emphasis in original). More significantly, none of Dr. Hartman's proposed methods demonstrates individual impact to members of the end payor plaintiffs' classes. *See also* Defs.' Opp'n, Ex. 3 (Hartman Dep.) at 93:10–93:16 (A: "Well, there has been a different—there has been different quanta of effects for different class members and some of those quanta for certain purchasers are zero and they're the ones you're identifying." Q: "How will you identify those people?" A: "This report doesn't go after that.").

Because the end payor plaintiffs had not made the stronger showing deemed necessary under the indirect purchaser statutes of Florida, Maine, Minnesota, and Michigan, end payor plaintiffs from these states were excluded from the exemplar classes.

### i) Unilateral Monopolies

In addition to the "skeptical" interpretations discussed above—which some might describe as differences "in nuance," *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293, 1300 (7th Cir.1995)—an examination of state antitrust laws also reveals differences in their terms. For example, the antitrust statutes of several states extend only to concerted conduct, not to unilateral conduct of the

---

**18.** Certainly, the denials of certification also reflect other factors. *See e.g., Gordon,* 2001 WL 366432, at *6 (considering prior denials "different," not only because those plaintiffs lacked workable methods for calculating damages, but also because they had sued more defendants, bought more products, and made more purchases). The Court simply notes that views regarding antitrust policies and proof are among the relevant factors, and in some cases, are the most significant among them. *See A & M Supply,* 252 Mich.App. at 633, 641, 654 N.W.2d 572 (finding certification inappropriate on facts "virtually identical" to those of *Gordon* based on a more skeptical review of the evidence).

sort alleged here. *See Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768–69, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (discussing the rationale for "treat[ing] concerted behavior more strictly than unilateral behavior" under the analogous federal statute: "Concerted activity inherently is fraught with anticompetitive risk."). For these states, discussed below, the Court considers the alternative statutory and equitable claims asserted by the end payor plaintiffs.

▉ Under California law, a challenge to unilateral conduct does not state a cognizable antitrust claim. *See Dimidowich v. Bell & Howell,* 803 F.2d 1473, 1478 (9th Cir.1986) (stating that a challenge to unilateral conduct is "not cognizable under the Cartwright Act, for it fails to allege any combination"), *modified on other grounds,* 810 F.2d 1517 (9th Cir.1987). In addition to the Cartwright Act, the end payor plaintiffs cite the unfair competition statute, Cal. Bus. & Prof.Code §§ 17200–17208. Compl. ¶ 102(b). As interpreted by the California Supreme Court, the scope of this statute is broad: "The statutory language referring to 'any unlawful, unfair or fraudulent' practice (italics added) makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.,* 20 Cal.4th 163, 180, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). The end payor plaintiffs thus may assert that SmithKline's unilateral conduct, even if permissible under the Cartwright Act, is actionable under the unfair competition statute. *See Motors, Inc. v. Times Mirror Co.,* 102 Cal.App.3d 735, 741, 162 Cal.Rptr. 543 (1980) (concluding that the plaintiff adequately stated a claim of unfair competition even though it had not alleged "any agreement, understanding, or conspiracy to restrain trade"). As stated above, the California unfair competition statute, like those of other exemplar states, parallels Section 5 of the Federal Trade Commission Act with regard to prohibited practices. *See Cel–Tech Communications,* 20 Cal.4th at 185, 83 Cal. Rptr.2d 548, 973 P.2d 527. The Court accordingly included plaintiffs from California

in the end payor plaintiff classes, concluding that claims asserted under the unfair competition statute, notwithstanding their more limited remedies, *id.* at 179, 83 Cal.Rptr.2d 548, 973 P.2d 527 (stating that prevailing plaintiffs generally may seek injunctive and restitutionary remedies only), are sufficiently similar to those asserted under the statutes of other exemplar states.

▉ Although "broad and undeveloped by case law," *Bergstrom v. Noah,* 266 Kan. 829, 842, 974 P.2d 520 (1999), the Kansas Monopolies and Unfair Trade Act, Kan. Stat. Ann. § 50–132, by its terms prohibits combinations and conspiracies only. *See* Kan. Stat. Ann. § 50–132 ("No person, servant, agent or employee of any person doing business within the state of Kansas shall *conspire or combine* with any other persons, within or without the state for the purpose of monopolizing any line of business ...." (emphasis added)). In addition to the Monopolies and Unfair Trade Act, the end payor plaintiffs cite the Consumer Protection Act, Kan. Stat. Ann. §§ 50–623 to –644. Actions brought under the Consumer Protection Act are subject to a three-year statute of limitations. *Alexander v. Certified Master Builders Corp.,* 268 Kan. 812, 824, 1 P.3d 899 (2000). This Court previously determined that the end payor plaintiffs' claims accrued for statute of limitations purposes on August 8, 1998. *Relafen,* 286 F.Supp.2d at 64 (holding that the plaintiffs' claims were timely under the four-year statute of limitations applied to federal antitrust actions). The earliest of the end payor plaintiffs' complaints was filed on January 30, 2002, more than three years after the date of accrual. *See* Lynch Compl. [Doc. No. 1 in *Lynch v. SmithKline Beecham Corp.,* Civil Action No. 02–CV–10163]. Because claims asserted under the Kansas Consumer Protection Act are subject to an individualized limitations defense, end payor plaintiffs from Kansas were excluded from the exemplar classes.[19] *See Waste Management,* 208 F.3d at 296 ("[A] necessity for individualized statute-of-limitations determinations invariably weighs

---

**19.** In so excluding the Kansas plaintiffs, the Court makes no comment on the validity of the end payor plaintiffs' previously asserted claim of

fraudulent concealment. *See Relafen,* 286 F.Supp.2d at 64 n. 4. It merely finds the claim inappropriate for class treatment.

against class certification under Rule 23(b)(3) ....").

■ The Tennessee Trade Practices Act, Tenn.Code Ann. § 47–25–101, declares the following anticompetitive conduct to be "against public policy": "all arrangements, contracts, agreements, trusts, or combinations *between persons or corporations* designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article." *Id.* (emphasis added). None of these terms appears to include unilateral conduct. *See* 6 Julian O. von Kalinowski, *Antitrust Laws and Trade Regulation* § 116.03 (2d ed.2003). The end payor plaintiffs also allege violations of the Consumer Protection Act, Tenn.Code Ann. §§ 47–18–101 to—108. Compl. ¶ 102(u). Although modeled after the Federal Trade Commission Act, the Tennessee Consumer Protection Act differs in one significant respect: unlike the federal provision, which prohibits both unfair methods of competition and unfair or deceptive acts or practices, the Tennessee statute prohibits only unfair or deceptive acts or practices. *Sherwood v. Microsoft Corp.,* No. M2000–01850–COA–R9–CV, 2003 WL 21780975, at *31 (Tenn.Ct.App. July 31, 2003). The Tennessee Court of Appeals has interpreted this difference to reflect a conscious choice to exclude unfair methods of competition from the scope of the Tennessee Act:

> This history makes clear that by the time Tennessee adopted its Consumer Protection Act, its drafters and the legislators considering it had the benefit of the federal act and experience under it, the proposed Uniform Trade Practices Act and Consumer Protection Law, the statutory language adopted in many other states, and the evaluations of a number of authors of learned articles and treatises. We cannot presume other than that the Tennessee General Assembly knowingly chose not to include antitrust or anticompetitive conduct as actionable under the TCPA.

*Id.* at *32. Because neither of their statutory claims is cognizable under state law, end payors from Tennessee were included in the exemplar classes with respect to their claims for unjust enrichment only.[20]

### ii) Restrictions on Remedies

■ Under New York law, "an action to recover a penalty ... imposed by statute may not be maintained as a class action" unless the statute imposing the penalty "specifically authorizes" class recovery. N.Y. C.P.L.R. 901(b). For purposes of this rule, the treble damages permitted by the New York antitrust statute, N.Y. Gen. Bus. Law §§ 340–347 (the "Donnelly Act"), have been deemed a "penalty." *Asher v. Abbott Labs.,* 290 A.D.2d 208, 737 N.Y.S.2d 4, 4 (N.Y.App. Div.2002); *Cox v. Microsoft Corp.,* 290 A.D.2d 206, 737 N.Y.S.2d 1, 2 (N.Y.App.Div. 2002). Because the Donnelly Act imposes a "mandatory" penalty but does not "specifically authorize" class recovery, New York courts have dismissed class actions brought under the Act as impermissible. *See Asher,* 737 N.Y.S.2d at 4; *Cox,* 737 N.Y.S.2d at 2. These decisions suggest that C.P.L.R. 901(b), if applicable, would bar the end payor plaintiffs from pursuing their claims under the Donnelly Act in the present class action.

It is not, however, completely clear that C.P.L.R. 901(b) ought be applied by federal courts. *But see In re Microsoft Corp. Antitrust Litig.,* 127 F.Supp.2d 702, 727 (D.Md. 2001) (concluding that C.P.L.R. 901(b) required dismissal of the plaintiffs' class action claims without considering whether the state rule applied in federal courts). Under *Hanna v. Plumer,* 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965), if the law of the relevant state is in "direct collision" with a valid Federal Rule of Civil Procedure, *id.* at 472, 85 S.Ct. 1136, the "Federal Rule applies regardless of contrary state law." *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 428 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) (citing *Hanna,* 380 U.S. at 469–74, 85 S.Ct. 1136). The Court's initial inquiry, then, is whether C.P.L.R. 901(b) directly conflicts

---

**20.** Although Tennessee courts have required that unjust enrichment plaintiffs first exhaust their legal remedies, *see Paschall's Inc. v. Dozier,* 219 Tenn. 45, 57–58, 407 S.W.2d 150 (1966), such exhaustion would be futile here as the Tennessee plaintiffs' statutory claims are not cognizable under the state's antitrust or consumer protection laws.

with the applicable Federal Rule, Rule 23. *See* 19 Wright, Miller & Cooper, *supra,* § 4504.

On its face, Rule 23 "merely establishes the procedures for pursuing a class action in the federal courts." *Wade v. Danek Med., Inc.,* 182 F.3d 281, 290 (4th Cir.1999). It sets forth the circumstances under which "[o]ne or more members of a class may sue or be sued as representative parties," but makes no reference to the remedies that representative parties may seek. *See* Fed.R.Civ.P. 23. In addition, Rule 23, like all Federal Rules, must be interpreted "with sensitivity to important state interests and regulatory policies" that may be frustrated by the application of federal procedures. *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 428 n. 7, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

Here, C.P.L.R. 901(b) expresses a state interest in avoiding "annihilatory punishment" by discouraging multiple recoveries of statutory penalties. *See Lennon v. Philip Morris Cos., Inc.,* 189 Misc.2d 577, 734 N.Y.S.2d 374, 380 (N.Y.Sup.2001) (quoting Joseph M. McLaughlin, *Practice Commentaries,* C901:7, N.Y. C.P.L.R. 901(b) (McKinney)). As one commentator explains: "The increased deterrent effect class actions create may intensify the already heightened deterrent effect of a penalty provision, to a point perhaps counter-productive to statutory policies." *Developments in the Law—Class Action,* 89 Harv. L.Rev. 1329, 1361 (1976). With regard to statutory policies, the Court considers it significant that "since enacting the Donnelly Act, the New York State Legislature has twice considered the indirect purchasers['] right to bring suit," but has adopted "no express language[ ] ... which authorizes the maintenance of a class action." *Lennon,* 734 N.Y.S.2d at 381. In light of the text and policies of the provisions, the Court declines to interpret Rule 23 so broadly as to control the remedial issues governed by C.P.L.R. 901(b) and the Donnelly Act. Accordingly, the Court discerns no direct conflict between the state law and the Federal Rule. *See United States v. Dentsply Int'l, Inc.,* Nos. Civ. A. 99–005–SLR, 99–255–SLR, 99–854–SLR, 2001 WL 624807, at *16 (D.Del. Mar. 30, 2001) (distinguishing the scope of Rule 23 from that of C.P.L.R. 901(b)); *but cf. Bridgestone/Firestone,* 205 F.R.D. at 516, *rev'd in part on other grounds sub nom. In re Bridgestone/Firestone, Inc.,* 288 F.3d 1012 (refusing to apply the reasoning of *Dentsply International,* and concluding that a Michigan provision limiting class action plaintiffs to those residing or injured in the state conflicts with Rule 23).

Because it found no "direct collision" between the state and federal provisions, the Court's decision whether to apply C.P.L.R. 901(b) was guided not by *Hanna,* but by the "twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws." 19 Wright, Miller & Cooper, *supra,* § 4504 (quoting *Hanna,* 380 U.S. at 468, 85 S.Ct. 1136); *see Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Significant to the Court's *Erie* analysis was the fact that New York courts consistently apply C.P.L.R. 901(b) to bar class actions brought under the Donnelly Act. *See Cox,* 737 N.Y.S.2d at 2; *Asher,* 737 N.Y.S.2d at 4; *Lennon,* 734 N.Y.S.2d at 380 ("Even where treble damages are discretionary and need not be sought by the injured party, it is this Court's understanding that no New York court has sustained such a claim either under the Donnelly Act or any other statutory provision."). For this reason, declining to apply C.P.L.R. 901(b) would clearly encourage forum-shopping, with plaintiffs and their attorneys migrating toward federal court to obtain the "substantial advantages" of class actions. *See Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 338–39 & n. 9, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) (discussing the increased fees and decreased costs associated with class actions). In addition, permitting Donnelly Act class actions exclusively in federal court would inequitably injure plaintiffs unable to demonstrate diversity of citizenship. *See Walker v. Armco Steel Corp.,* 446 U.S. 740, 753, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980) (finding it inequitable that an action barred in the state courts should proceed to judgment in the federal courts "solely because of the fortuity that there is diversity of citizenship between the litigants"); *Dornberger v. Metropolitan Life Ins. Co.,* 182 F.R.D.

72, 84 (S.D.N.Y.1998) (applying C.P.L.R. 901(b) because it would be "patently unfair" not to). Accordingly, the Court determined that C.P.L.R. 901(b) should be applied and that the end payor plaintiffs' claims under the Donnelly Act are therefore barred.

The Court's application of C.P.L.R. 901(b) does not, however, necessarily bar the end payor plaintiffs' claims under the New York consumer protection act, N.Y. Gen. Bus. Law § 349. Compl. ¶ 102(q). Under Section 349(h), private plaintiffs may recover actual damages, a statutory minimum, or up to treble damages if the court finds a willful or knowing violation. N.Y. Gen. Bus. Law § 349(h). As with the Donnelly Act, because this Section does not "specifically authorize" class recovery, C.P.L.R. 901(b) bars class claims for minimum or treble damages. *Super Glue Corp. v. Avis Rent A Car Sys., Inc.*, 132 A.D.2d 604, 517 N.Y.S.2d 764, 767 (N.Y.App.Div.1987). Class claims for actual damages, in contrast, are not similarly barred. *Id.* Accordingly, "the weight of authority holds that a class action may be maintained to recover actual damages and injunctive relief pursuant to General Business Law § 349(h)." *Id.*

Yet bringing such an action requires named plaintiffs to waive their claims to minimum and treble damages. *See id.; Burns v. Volkswagen of Am., Inc.*, 118 Misc.2d 289, 460 N.Y.S.2d 410, 413 (N.Y.Sup.Ct.1982). Such waiver necessarily casts doubt on the named plaintiffs' fitness to represent class members who might prefer to pursue statutory or punitive remedies individually. *See Burns*, 460 N.Y.S.2d at 413; *cf. Molski v. Gleich*, 318 F.3d 937, 956 (9th Cir.2003) (finding representation of the settlement class inadequate where the terms of the consent decree "waived practically all of the class members' claims without compensation and allowed the defendants to escape with little penalty"); *Arch v. American Tobacco Co.*, 175 F.R.D. 469, 480 (E.D.Pa.1997) ("Indeed, named plaintiffs who would intentionally waive or abandon potential claims of absentee plaintiffs have interests antagonistic to those of the class.").

Nor are the Court's concerns lessened because "any class member wish[ing] to pursue his or her statutory right to minimum and treble damages ... may opt out of the class." *Super Glue Corp.*, 517 N.Y.S.2d at 767. Scholars have recognized that as a practical matter, the opportunity to opt out is "unevenly distributed," with far lesser opportunity held by plaintiffs like those here, who have small rather than independently viable claims, and who receive "best practicable" rather than individual notice. *See* Michael A. Perino, *Class Action Chaos? The Theory of the Core and an Analysis of Opt–Out Rights in Mass Tort Class Actions*, 46 Emory L.J. 85 (1997); John Bronsteen & Owen Fiss, *The Class Action Rule*, 78 Notre Dame L.Rev. 1419, 1435 (2003) (discussing the importance of notice in "render[ing] viable the right of unnamed class members ... to intervene or to opt out of the lawsuit"); Theodore Eisenberg & Geoffrey P. Miller, *The Role of Opt–Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues* (Mar. 23, 2004) (unpublished manuscript) (testing scholars' conclusions against empirical data and reporting that "[o]pt-out rates vary by case type," with consumer class actions having a relatively low mean opt-out rate of less than 0.2 percent). In light of these adequacy concerns regarding their consumer protection act claims, plaintiffs from New York were excluded from the exemplar classes.

### iii) Direct Benefit

Under North Carolina law, "to establish a claim for unjust enrichment, a party must have conferred a benefit" that was "consciously accepted" by the defendant. *Booe*, 322 N.C. at 570, 369 S.E.2d 554. The benefit must be neither officious nor gratuitous, and it must be measurable. *Id.* The North Carolina Court of Appeals has suggested that in addition to these things, the benefit must be direct. *See Effler v. Pyles*, 94 N.C.App. 349, 353, 380 S.E.2d 149 (1989). *But see Terazosin*, 2004 WL 828997, at *23 n. 40 (concluding, without reference to *Effler*, that the standard for evaluating unjust enrichment claims is "virtually identical" across various states including North Carolina). In *Effler*, the court affirmed the entry of summary judgment against a plaintiff who failed

to show that she had conferred a benefit directly on the defendant:

> Linda Pyles received title to the property through her husband. Although *he* had previously acquired his interest in this property with plaintiff's assistance, this does not satisfy plaintiff's burden of showing that she conferred a benefit directly on defendant Linda Pyles.

94 N.C.App. at 353, 380 S.E.2d 149

The end payor plaintiffs have similarly failed to satisfy this burden. Any enrichment that SmithKline received was conferred more directly by pharmaceutical wholesalers than by end payors, who by definition purchased Relafen from sources other than SmithKline. Proposed Order at 1. Moreover, as in *Effler*, the fact that many pharmaceutical wholesalers passed on and in fact benefitted from the overcharges paid by end payors, *see Valley Drug*, 350 F.3d at 1193, does not change the Court's analysis. Accordingly, because North Carolina plaintiffs would be subject to an individualized defense regarding the "direct benefit" element of their unjust enrichment claims,[21] they were excluded from the exemplar classes.

After thus limiting the exemplar classes to account for differences in state law, the Court concluded that the end payor plaintiffs had demonstrated the predominance of common issues for the remaining class members. The Court accordingly turned to superiority, the final requirement of Rule 23.

### 2. Superiority

■ As stated by the Supreme Court in *Amchem*, the requirement of superiority, like that of predominance, ensures that resolution by class action will "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615, 117 S.Ct. 2231 (alteration in original) (quoting Advisory Committee's Note on Fed.R.Civ.P. 23) (internal quotation marks omitted). With its focus on individuals' interests in conducting separate lawsuits, the superiority requirement directly addresses the Advisory Committee's core concern: the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Id.* at 617, 117 S.Ct. 2231 (quoting Benjamin Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L.Rev. 497, 497 (1969)) (internal quotation marks omitted).

The Advisory Committee's core concern was particularly compelling here, where protection of the public depends upon vigorous private enforcement of state laws but the small size of individual claims renders such enforcement unlikely. *See* Hartman Decl., tbl. 2 (documenting differences between branded and generic prices that range from $0.35 to $1.21 per pill); Bronsteen & Fiss, *supra*, at 1419 ("The most compelling [use of the class action] occurs when someone inflicts a small harm on each member of a large group of people."); *cf. Illinois Brick*, 431 U.S. at 745, 97 S.Ct. 2061 (discussing, with respect to the analogous federal statute, the "important weapon" of private enforcement and selecting the direct purchaser rule in part to ensure adequate incentives to sue). Moreover, given the predominance of common questions, resolution of the end payor plaintiffs' numerous claims by class action would provide substantial savings in time, effort, and expense. *See* 7B Wright, Miller & Kane, *supra*, § 1781 ("Since antitrust actions typically present many complicated issues, the courts should utilize these [class action] provisions to settle the common issues on a representational basis to avoid congesting the courts with separate actions requiring the repetitive adjudication of the same matters.").

Turning now to the pertinent factors identified in Rule 23(b)(3), the Court emphasizes

---

21. In an unpublished opinion, the Fourth Circuit suggested that on different facts, North Carolina courts adopt "a broader approach to unjust enrichment than is indicated by *Effler's* 'direct benefit' rule." *Metric Constructors, Inc. v. Bank of Tokyo–Mitsubishi, Ltd.*, 72 Fed.Appx. 916, 921 (4th Cir.2003). This Court makes no comment on the end payor plaintiffs' ability to distinguish the present facts from those of *Effler*. It merely concludes that any attempt to do so would be inappropriate for consideration in the present class action. The Court also notes that citation of unpublished opinions is disfavored in the Fourth Circuit. *See* 4th Cir. R. 36(c).

again that small size of the end payor plaintiffs' claims suggests that class members' "interest ... in individually controlling the prosecution or defense of separate actions," Fed.R.Civ.P. 23(b)(3)(A), is limited—if not nonexistent. *See McIntosh v. Irwin Union Bank & Trust, Co.* 215 F.R.D. 26, 35 (D.Mass.2003) ("It cannot be reiterated too strongly that denial of class certification is the effective death knell of this litigation."). In addition, the Court is not aware of any other "litigation concerning the controversy," Fed.R.Civ.P. 23(b)(3)(B), that might create a threat of "multiplicity" or "inconsistent adjudications," 7A Wright, Miller & Kane, *supra*, § 1780. In fact, the consolidation of several related claims—including those of a generic manufacturer and a separately certified class of direct purchasers—before this Court suggested that consistency would best be served by "concentrating the litigation" in this forum. Fed.R.Civ.P. 23(b)(3)(C).

As in most multi-state class actions, potential "difficulties likely to be encountered in the management of" this action, Fed.R.Civ.P. 23(b)(3)(D), posed a more serious concern. *See Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 677 (7th Cir.2001) (observing that "[n]agging issues of choice of law, commonality, and manageability" beset a proposed national class action); *In re LifeUSA Holding Inc.*, 242 F.3d 136, 148 (3d Cir.2001) (declaring that an adjudication that involved individual determinations of, *inter alia*, state law "would not only be inordinately time consuming and difficult, but it would impermissibly transgress upon the required standards of fairness and efficiency"). Nevertheless, having thoroughly examined the relevant statutes, the Court concluded that the remaining states' laws are neither so varied nor so numerous as to render this action unmanageable. *See Waste Management*, 208 F.3d at 296–97 (affirming certification notwithstanding variations in states' statutes of limitations where "the limitations problems nonetheless appeared to be inconsequential"). The Court acknowledges that difficulties might later arise concerning, for example, the availability of certain remedies, *see* Defs.' Opp'n at 28–30, but the Court concluded that any damages-related difficulties could be more appropriately dealt with as they arose. *Yaffe v.*

*Powers,* 454 F.2d at 1365 (1st. Cir.1972); *see also Visa Check/MasterMoney,* 280 F.3d at 140–41 (citing *Yaffe* and describing the several "management tools available to a district court to address any individualized damages issues that might arise in a class action"). The Court accordingly concluded that the end payor plaintiffs had established superiority as required under Rule 23(b)(3).

## IV. CONCLUSION

For the foregoing reasons, the End Payor Plaintiffs' Motion for Class Certification [Doc. No. 119] was ALLOWED in part and DENIED in part. The motion was DENIED under Rule 23(b)(2), and ALLOWED under Rule 23(b)(3) for the following exemplar classes:

With respect to their antitrust and consumer protection claims—

All persons or entities who purchased Relafen or its generic alternatives in the states of Arizona, California, Massachusetts, or Vermont during the period of September 1, 1998 through June 30, 2003 for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

and with respect to their unjust enrichment claims—

All persons or entities in the United States who purchased Relafen in the states of Arizona, California, Massachusetts, Tennessee, or Vermont during the period September 1, 1998 through June 30, 2003 for consumption by themselves, their families, members, employees, insureds, participants, or beneficiaries.

Excluded from both classes were governmental entities; SmithKline and its officers, directors, management, employees, subsidiaries, and affiliates; persons or entities who purchased Relafen for purposes of resale; and persons or entities who purchased Relafen directly from SmithKline or its affiliates.